(No. 15291.—Judgment affirmed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. CHARLES SELKNES, Plaintiff in Error.

*Opinion filed June 20, 1923—Rehearing denied October 4, 1923.*

1. CRIMINAL LAW—*what is a dying declaration.* A dying declaration is a statement relating to the facts of an injury of which the party afterward dies and which is made under the fixed belief and moral conviction that immediate death is inevitable, without opportunity for repentance and without hope of escaping the impending danger.

2. SAME—*when written statement is competent as a dying declaration.* In a prosecution for murder a written statement signed by the victim and relating to the cause of his injury is competent as a dying declaration where the declarant died immediately after signing the statement, although before signing the instrument he submitted to an operation in the hope that death might be avoided.

3. SAME—*what does not render dying declaration incompetent.* The fact that the assistant State's attorney who signed a written dying declaration as a witness, and another witness who was not a physician, told the declarant that he was about to die, does not render the declaration incompetent if it is otherwise competent.

4. SAME—*substance of dying declaration is subject to ordinary rules of evidence—opinions.* The rules of evidence are the same as to the relevancy and competency of the subject matter of a dying declaration as of the testimony of a witness, and matters of opinion, belief and conclusion are not competent; but where no objection is made except to the entire statement as not being a competent dying declaration, the statement, if competent as a dying declaration, may be admitted even though a portion of it contains the conclusion of the declarant as to the motive of the crime.

5. SAME—*when revolver is admissible in evidence.* In a prosecution for murder, which occurred in a building occupied by the defendant and his victim as partners in business and in which the parties resided, a revolver found recently buried in the sand in the basement of the building, to which place no persons other than the defendant and the wife of his victim had access, is admissible in evidence against the defendant where it is of the same caliber as the bullets with which the murder was committed and near by was one cartridge fitting a revolver found in the defendant's room.

6. SAME—*when statement is admissible as having been made in presence of defendant.* In a prosecution for murder, a statement

309—8

by the victim accusing the defendant of the crime and made to witnesses who reached the scene just after the crime was committed is admissible against the defendant, where one of the witnesses testifies that the statement was made in the presence of the defendant though the other cannot say the defendant was present.

7. SAME—*what evidence is admissible on question of motive.* In a prosecution for murder, evidence as to intimate relations between the defendant and the wife of the victim of the crime is admissible as throwing light on the question of motive, where, although the parties were partners in business, there is no evidence of any personal difficulty between them.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. PHILIP L. SULLIVAN, Judge, presiding.

O'BRIEN, PRYSTALSKI & OWEN, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and EDWARD C. FITCH, (EDWARD E. WILSON, and CLYDE C. FISHER, of counsel,) for the People.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

The plaintiff in error, Charles Selknes, was indicted, tried, found guilty and sentenced to the penitentiary for a term of thirty years for the murder of Boleslaw Abarowitz, by shooting him with a revolver.

The defendant and Abarowitz were Lithuanians and partners in a business conducted in a building at Willow Springs, in Cook county, called Zenk's Hotel. In the front of the building, on the first floor, there was what the witnesses called a soft drink parlor, with a dining-room back of it and kitchen in the rear. On the second floor there was a sort of parlor in front and a hall and bed-rooms back of it, occupied by the partners and the wife of Abarowitz and their five-year-old child, and others let out to transient roomers. John W. Rust, a doctor, lived two blocks from the place of business, and on November 28, 1921, between

three and four in the morning, he was called by telephone that there was trouble at the place; that the speaker had big trouble and somebody was shot, and the doctor thought the voice was that of the defendant. John H. Banks, a merchant, had a store next to the building in question, with an alley between, and about the same time as the telephone call his mother called him and said that there was somebody hollering for help over there,—hollering that they were shot. Banks got up and went to the building and met the defendant and asked him if he had sent for a doctor, and the defendant said that he had. Banks ran to the doctor's house and pounded on the door while the doctor was dressing. The doctor and Banks went to the building and found the defendant in the saloon. He asked the doctor if he could not do something to help him. The doctor and Banks went up-stairs and found Abarowitz in a room, with the door barricaded with the bed. They asked him to open the door, and after some words he did so. The doctor examined him and found five bullet wounds and a large pool of blood on the floor. The blood on the floor and on the wounds was clotted, showing that the shooting had been two or three hours before. The doctor testified that Banks and Mrs. Abarowitz went up-stairs with him, and the defendant appeared shortly after and was in the hallway after the doctor got into the room. The doctor asked Abarowitz how it happened, and he said, in the presence of the defendant, who was standing in the doorway: "Charlie shot me! Charlie shot me! Don't let him in, doctor! Don't let him in! He came in once before and fired a bullet straight at me, and he and my wife begged to come in,—they would help me and then turned and shot me. Charlie tried, and my wife tried to get in and wanted to help me and fired a gun at me and clicked several times. Don't let him in! He may do something like that! Don't let him in! He wants my money and my wife and everything I have got, and he wants me out of the way, and he shot me." The

doctor testified that when Abarowitz said Charlie shot him, he said, "You don't mean your partner, do you?" and he said, "Yes; he wants my wife and my money and he wants me out of the way." The doctor's testimony was that Abarowitz knew everything he was saying and his mind was clear. The wounds were made with 38-caliber bullets.

The doctor was president of the village board, and Banks testified that he suggested that he should go after William Laatz, a village trustee, and that he went after him, as he thought, ten or fifteen minutes after he got to the building. Laatz testified that Banks came after him about 4:30 in the morning, but he did not know the exact time; that when he got to the place the defendant and Mrs. Abarowitz were in the kitchen; that the defendant told him they had a little trouble there a couple of weeks ago with some Mexicans, and he thought a Mexican shot Bill, (a name by which Abarowitz was ordinarily called;) that he went up-stairs and found Abarowitz in bed, and he threw back the bedclothes and showed where he was shot. Laatz told the defendant it looked bad and asked him if he had a gun, and the defendant said he had one in his room, under his pillow. They went up to the room and found a revolver of 32-caliber, and Laatz arrested the defendant, took him to the station and locked him up. After the arrest of the defendant, Laatz went back to the place and made a thorough search of the premises, after which he went down in the basement and found a place where there was fresh earth, and digging there he found buried in the sand a 38-caliber revolver, a box of 38-cartridges, and with them a 32-caliber cartridge which showed marks of being struck by a revolver hammer but had not exploded. There were two empty chambers in the revolver, two empty shells and two loaded cartridges.

At the instance of Dr. Rust, Abarowitz was taken to the Jefferson Park Hospital at about 7:30 in the morning. Dr. Ira R. Robertson, a surgeon at the hospital, testified

that he examined Abarowitz about 8 :30 and found him suffering from internal hemorrhage from gunshot wounds, and found a perforation through the liver, a perforation through the first part of the small bowel, and other wounds. The doctor said that he found Abarowitz in a serious condition and did not think he was going to live very long but did not remember whether he told the man that or not. He said that he told him he was very sick and would either have to be operated on or he was going to die; that if he was not operated on he was going to die sure, and he said he wanted to be operated on. The doctor said he operated and the operation was concluded about ten o'clock, but he did not remember the exact time. Abarowitz died about 1 :30 P. M. of the same day. Mrs. Abarowitz, with the child, went to the hospital, but there is no further evidence concerning her being there.

Otto W. Christopher, an assistant State's attorney, testified that he left the office of the State's attorney about ten o'clock and went to the hospital and there wrote a dying declaration, which was signed by Abarowitz. Christopher and Loine Hawthorne, the X-ray operator at the hospital, signed the dying declaration as witnesses, and there were repeated lengthy examinations of them on the question of the admissibility in evidence of the declaration. Christopher testified that he asked for the man who was dying; that the nurse told him that Abarowitz was dying, and he was directed to the room where Abarowitz was; that he told him that he represented the State's attorney and came to find out who shot him and to get a statement from him; that he told Abarowitz that he was very sick and was about to die, and asked him if he knew he was going to die, and Abarowitz said he did,—that he was not going to live very long. Hawthorne testified that Abarowitz was dying, and he and Christopher both informed him of that fact and asked him if he understood it, and he said that he did. These statements were often repeated in the lengthy exami-

nations, and the witnesses both testified that after Abaro-
witz said he was not going to live very long he made the
statement, which was written with a lead pencil by Chris-
topher; that Abarowitz had a hemorrhage while making the
statement, so that he had to lie still from three to five min-
utes; that the statement, when written, was read one sen-
tence at a time, and Abarowitz was asked each time if that
was right, and he said it was, and when it was all through
Abarowitz signed it. At the bottom of the statement there
were the following words, "I know I am about to die and
have no hope of recovery and make this statement," and
this appeared to have been interlined. Christopher said that
it was not the language of Abarowitz, but that Abarowitz
had just told him he was going to die and would not live
very long. The declaration was admitted in evidence over
the objection of the defendant, and it stated that the de-
fendant shot Abarowitz on Monday morning, November 20,
at 12:20 A. M., in the saloon, back of the part; that he fired
seven shots at him; that he came back of the bar and said
nothing and commenced firing; that Abarowitz went up-
stairs after he was shot and went to bed; that the defend-
ant came up to him without warning of any kind and com-
menced firing at him; that no other person was present at
the time of the shooting; that the defendant came back to
the bed-room the third time and again tried to kill him;
that Abarowitz was bleeding and shut the door and pushed
the bed in front of the door so that the defendant could
not get in, and opened the window and called for help.

As already stated, there were repeated lengthy exami-
nations of Christopher and Hawthorne and strenuous ob-
jection to the admission in evidence of the dying declara-
tion, and it is insisted that the court erred in the ruling
because the evidence did not show that Abarowitz had de-
spaired of life and was under the belief of almost immedi-
ate death. That he was fatally wounded and about to die
and that there was no chance of recovery is beyond ques-

tion, but the argument is that he was not convinced of the fact on account of what Dr. Robertson had told him. The doctor had testified that he told Abarowitz he was very sick and would either have to be operated on or he was going to die; that if he was not operated on he was going to die sure, and he said he wanted to be operated on. From this the conclusion is drawn that Abarowitz had in mind that the operation might be successful in saving his life and that he took the chances of the operation. The statement of the doctor was made, as he testified, at 8:30, and there was an immediate operation, which was concluded about ten o'clock, and it was after that time when Abarowitz expressed his belief that he would not live very long. Dying declarations are such as are made relating to the facts of an injury of which the party afterward dies under the fixed belief and moral conviction that immediate death is inevitable, without opportunity for repentance and without hope of escaping the impending danger. (*Starkey* v. *People,* 17 Ill. 17.) The important question was the state of mind of Abarowitz at the time of making the declaration, and it was for the court, in the first instance, to determine upon the admissibility of the declaration from proof of the condition of his mind at the time it was made. There was no evidence that the operation had relieved Abarowitz or resulted in any benefit, and his condition was such, with the hemorrhage during the statement, that he must have understood that he was about to die. He was so informed by both Christopher and Hawthorne and said that he understood it. The fact that Christopher and Hawthorne stated to him that he was about to die did not render the declaration incompetent. (*Simons* v. *People,* 150 Ill. 66; *People* v. *Buettner,* 233 id. 272.) There were statements in the declaration in addition to what has been given above which would have been incompetent if Abarowitz had been a witness on the trial. The rules of evidence are the same as to relevancy and competency in the case of a dying declaration as if a

witness appears at the trial, and matters of opinion, belief and conclusion are not competent. The matters referred to were of that character, and if objection had been made to them the court undoubtedly would have struck them out. The objection was to the whole declaration, and the court did not err in overruling the objection because some parts of the declaration were incompetent. The incompetent statements were of the same character as the statements testified to by Dr. Rust as to the belief of Abarowitz concerning the motive of the shooting and the previous relation of the parties and were not of anything new.

It is contended that the court erred in admitting in evidence the revolver found buried in the sand in the basement because there was no evidence that defendant ever had it. The evidence was that it had been recently buried; that it was of the same caliber as the bullets with which the murder was committed; that there was a 32-caliber cartridge with it which there had been an attempt to fire but which had not exploded; that the basement was in the sole possession of the defendant and Mrs. Abarowitz and that no Mexican or other person had access to the basement. The court did not err in admitting the revolver and cartridges in evidence.

It is also alleged as error that the court denied the motion of the defendant to strike from the record the conversation of Dr. Rust with Abarowitz when Abarowitz stated that defendant shot him. The basis for the motion was that Banks testified that the defendant was not in the room or doorway while he was there and that he did not see the defendant up-stairs at any time that morning. Banks testified that he stayed in the room ten or fifteen minutes while the doctor was examining Abarowitz and then went after Laatz. Banks did not testify to the statement made by Abarowitz to the doctor, which the doctor said was in the presence of the defendant, and apparently did not hear it. Banks said that he did not see the defendant up-stairs any

time that morning, but he was not present all the time, and, at any rate, it was for the jury to determine whether the statement of the doctor or Banks as to the presence of the defendant was correct.

There was evidence that the relations between the defendant and Mrs. Abarowitz were quite intimate and that there were acts indicating a close relation between them,— not immoral in its character but tending to show an unusual degree of personal regard. The evidence was objected to, but it appeared that there had been no personal difficulty between Abarowitz and the defendant, and the evidence was competent as throwing light on the question of motive.

It is urged that the verdict was against the weight of the evidence. This is based upon the denial of the defendant of his guilt and a theory that some Mexicans might have killed Abarowitz, or a Mexican who it is said had a room in the building that night. The defendant denied that he committed the crime and testified that on the night of the homicide he slept up-stairs; that he had a 32-caliber revolver which he kept under his pillow and never saw the other revolver or the cartridges; that about 2:30 in the night Mrs. Abarowitz called him to wake up; that she heard shooting and somebody was shot; that he went downstairs and found Abarowitz lying on the floor of the saloon and asked him what was the matter; that Abarowitz was a little drunk with moonshine and said some Mexicans shot him. The defendant also testified that there had been Mexicans on the railroad who had been in the saloon about two weeks before the homicide and one of them threw a glass of beer at him and they had a fight, in which the defendant was cut with a razor in the face, but they chased the Mexicans out. The supposition that Abarowitz might have been killed by Mexicans is a purely fanciful theory based on nothing substantial, and the judgment cannot be set aside because the evidence was not sufficient to establish guilt beyond a reasonable doubt.

Finally it is contended that the court erred in overruling a motion for a new trial, based on affidavits of inability to secure the attendance of Mrs. Abarowitz at the trial. She made an affidavit of facts tending to show that the defendant was innocent; that the murder was by Mexicans, and that she did not know the date of the trial but had learned that the defendant had been convicted. It appeared on the trial by the testimony of the defendant that the establishment had been sub-let and Mrs. Abarowitz went there every month to collect rent and that he had not attempted to learn where she lived. The defendant was at liberty on bail, and there was no sufficient evidence of the required diligence. The court did not err in denying the motion.

The judgment is affirmed.      *Judgment affirmed.*