JOHN T. MATHEWS V. STATE OF NEBRASKA.

FILED FEBRUARY 13, 1924. No. 23365.

1. **Criminal Law:** QUESTIONS FOR JURY. Disputed questions of fact, and of the credibility of witnesses as well, are for the jury.

2. ———: DYING DECLARATIONS. It is elementary that a dying declaration is admissible in homicide cases, and where such declaration has been received in evidence, under circumstances which make it proper to be so received, a subsequent statement may likewise be communicated to the jury without proof that it was made with knowledge of impending death, where it is so closely connected with the dying declaration, in point of time and substance, that it may properly be said to be a continuance thereof.

3. ———: ———. " Dying declarations, to be admissible in evidence, must be made under a sense of impending death. But it is unnecessary that the deceased should have stated at the time of making the same that he was about to die. It is sufficient if this state of mind appears from other testimony." *Fitzgerald v. State*, 11 Neb. 577.

4. ———: ———: INSTRUCTIONS. Defendant offered four separate instructions which in substance informed the jury, in differing forms of expression, but all of the same import, that dying declarations "are not entitled to the same weight as evidence as sworn statements made from the witness-stand in open court, for the reason that the defendant has had no opportunity to cross-examine the witness, and you have not had the opportunity of seeing and hearing her testify and of observing her conduct and demeanor on the witness-stand." *Held*, that it was not error to refuse the instructions.

5. ———: NEW TRIAL: NEWLY DISCOVERED EVIDENCE. "It is not error to overrule a motion for a new trial on the ground of newly discovered evidence, where it does not appear that such evidence, if introduced on a retrial, would probably change the result reached on the first trial." *Kerr v. State*, 63 Neb. 115.

6. Homicide: DYING DECLARATIONS. "In a prosecution for homicide in procuring an abortion under section 6 of the Criminal Code (now section 9547, Comp. St. 1922), dying declarations of the deceased may be admitted in evidence, under the same conditions and limitations as in prosecutions for murder or manslaughter." *Edwards v. State*, 79 Neb. 251.

ERROR to the district court for Douglas county: CHARLES A. GOSS, JUDGE. *Affirmed.*

*Wharton & Waldron* and *Magney & Magney*, for plaintiff in error.

*O. S. Spillman, Attorney General*, and *George W. Ayres, contra.*

Heard before MORRISSEY, C. J., LETTON, ROSE, DAY, GOOD and DEAN, JJ., SHEPHERD, District Judge.

DEAN, J.

Dr. John T. Mathews is a practicing physician residing at Omaha. An information was filed in Douglas county,

under section 9547, Comp. St. 1922, charging him with having produced an abortion upon the person of Loretta McDermott, an unmarried woman, on or about December 27, 1922, in Douglas county, from the effects of which she died January 4, 1923, at Omaha. Defendant was convicted and sentenced to serve a term of five years in the penitentiary. Alleging reversible error, he brings the record here to have it reviewed.

Miss McDermott was a school teacher, aged 24, residing with her father and four or five brothers and sisters on a ranch in Rock county, near Bassett. Late in December, 1922, she left her home for Fremont, where she visited a few days, and on Christmas afternoon she went to Omaha and visited at the home of a friend, Mrs. Nina Henry, who resided at 602 North Twenty-third street. Mrs. Henry testified that Miss McDermott left her home, to go down town, the morning of December 27, about 9 o'clock, and did not return until about 10 or 11 the morning of the 28th, when she came home in a taxicab; that she was then ill and had cramps and vomited and was up and down all that night; that her condition was such that on Friday, the 29th, at noon, she called Dr. William R. Strickland, of Omaha, by telephone to come to her home to give Miss McDermott professional attention.

Dr. Strickland, on the part of the state, testified that he went to Mrs. Nina Henry's residence Friday afternoon, December 29, in answer to Mrs. Henry's telephone call, and upon arrival he found Miss McDermott in bed and very ill; that he called the next morning, and finding her no better had her taken to the Lord Lister Hospital the same day; that he found she had been pregnant two or three months and had recently undergone an operation to effect a premature expulsion of fœtus, and that she had consequently aborted; that an abnormal condition of the kidneys was discovered which was induced by administering bichloride of mercury, that being a drug much used by abortionists. He also testified that when he discovered Miss McDermott's condition she gave a written statement at the hospital, in

respect of the operation, which was written down by him. The statement follows:

"Omaha, Neb., Dec. 31, 1922.

"I, Loretta McDermott, believing myself to be in a dying condition of my own free will make the following statement of my present condition. I was operated on by Dr. Mathews with offices in the Paxton Block, on Wednesday, Dec. 27 for the purpose of producing an abortion.

"LORETTA McDERMOTT.

"Witnesses: { W. R. STRICKLAND, M. D.
            { MISS J. ROMINGER, Student Nurse."

Miss Rominger testified that before the statement was signed the patient told her she knew she was very ill and that she was going to die unless something could be done; that owing to her weakened condition she requested the doctor to write the statement, and when it was read to her by him she said it was all right and signed it in their presence.

To avoid needless repetition, it may be observed here that Dr. S. McClenaghan, Dr. S. E. Isaacson, and Dr. E. C. Henry, who is not related to the witness Mrs. Nina Henry, were called in consultation by Dr. Strickland, and they corroborated the material evidence submitted by him in respect of her condition, and in respect of the fact that an abortion had been committed and that the kidneys were seriously affected by the ingredients which were administered to bring it about. With perhaps one exception the physicians above named participated in the *post mortem* which took place the day after Miss McDermott died.

Joseph W. Fleming, a real estate dealer, residing at 3562 Woolworth Avenue, Omaha, formerly lived in the vicinity of the McDermotts' Rock county home and had been acquainted with the family 25 years. January 3, which was the day before she died, Mr. Fleming accompanied Loretta's father to the hospital and she talked with him there about 20 minutes in the presence of a nurse. He testified that a priest had been there and had just left. He further testified:

Mathews v. State.

"Q. And did you have any conversation with her then about her condition? A. I did. Q. Just tell the jury what that conversation was. A. Well, I asked her father to leave the room, Pat McDermott, and then I went over and sat down on the bedside and took her by the hand; she rather put her hand out to me, and she said, 'Joe, I am going to die,' and I said, 'Well, Loretta, if that is God's will,' I said, 'If there is anything—is there anything that I can do for you, or anything that you want to tell me?' * * * Then she said to me, 'Joe, I will tell you it all, but don't tell Dad, for God's sake don't tell Dad.' * * * Then I said, 'Who sent you here?' And she said, 'A friend,' but would not tell me their name. And I says, 'Who was your doctor?' And she says, 'Doctor Mathews, in the Paxton Block.' I says, 'Where did you meet him?' And she says, 'I met him at his office,' And I says, 'Where did you go?' She says, 'I went to 2602 Cuming street.' I says, 'Did he go with you?' And she says, 'No, I went alone and he came later, * * * he did it alone and he used instruments.' * * * I says, 'Who paid for the operation?' She says, 'I paid $25 to Doctor Mathews and I gave him my check for the balance.' "

The next morning about 9 o'clock Miss McDermott died at the hospital.

Dr. Henry was called by the state. He testified, *inter alia*:

"Q. Now, Doctor, what would you say was the cause of death? A. I thought that some poison had been introduced into the womb that she had absorbed that caused her death. Q. Could you tell from your examination whether or not this girl had been pregnant? A. Well, she had all the earmarks of a pregnancy. * * * Q. Did you ever talk to her about how she got in that condition, what had happened to her? A. Yes. Q. About when was that? A. I cannot give you that date; Tuesday or Wednesday, I think. Q. Tuesday or Wednesday? A. The first day or so I didn't talk to her about her condition at all. Q. Just tell the jury what she said to you about

how she got in that condition Tuesday or Wednesday. A. We were trying to find out what this poison could have been, so she told us she had been taken to some house and an operation had been done on her, that she had not been given an anæsthetic and that the womb had been washed out after the operation. Q. Did she say who performed the abortion or the operation? A. She did. Q. Who did she say? A. Doctor Mathews."

A check written by Miss McDermott for $100 is in the record. Omitting a monogram and other immaterial matter the check reads:

"Basset, Neb., Dec. 27, 1922.

"State Bank of Bassett: Pay to the order of Cash $100.00, one hundred and no-100 dollars.

"LORETTA MCDERMOTT."

In respect of the check, Mrs. Henry testified that the day after Miss McDermott's death she called at Dr. Mathew's office and asked him if he was holding a check of Loretta McDermott; that he produced the check, which is in evidence, and she asked him to indorse it, but he refused, and for that reason she would not take it; that she went away and returned to his office alone about noon and handed him a $20 bill and five $1 bills; that defendant gave her the check and said: " 'Did you notice the check was for $100?' I told him no, I didn't, and I started back, and I says, 'Well, I can't take the check then.' He stood a minute, and he says, 'Well, I suppose the poor girl could not give any more money.' " It appears that she then took the check and went down stairs and handed it to Detective Ford, who was in waiting. Elsewhere in Mrs. Henry's evidence it appears that, when she paid the $25 to Dr. Mathews and obtained the check from him he had not yet found out that Miss McDermott died the day before.

The house at 2602 Cuming street, referred to by Mr. Fleming as being the place where Miss McDermott told him the operation was performed, is a large two-story residence occupied by a family named Sieverling.

A street-car conductor who lives across the street testi-

Mathews v. State.

fied that he knew defendant and his car, which bore the monogram "J. T. M.," and that in the 18 months preceding the date of the operation he saw defendant at the Sieverling place "on the average of every other day" and sometimes twice a day; that the doctor would frequently leave his car and enter the Sieverling house "with a handbag" and remain an hour and a half or two hours; that he saw the car at the Sieverling residence when he returned from his run at 8:14 in the forenoon of December 28, and that it remained there about an hour and a half. His wife testified that, subsequent to April, 1921, she saw defendant at the Sieverling residence on an average of three or four times a week, and that each time he remained there about an hour and a half; that sometimes the doctor's car "would drive up there and Mrs. Sieverling and sometimes just a lady and sometimes a lady and a man would get out. * * * I have seen it come with girls and young couples." Referring to the fatality that attended the McDermott operation, she said that she had not seen Dr. Mathews or any other doctors at Mrs. Sieverling's house "since this came out in the newspapers."

The evidence of the conductor, and of his wife, in respect of the frequency of the visits of the defendant to the Sieverling house was corroborated by at least three witnesses, and their evidence will be reviewed briefly. A witness who lived four doors west testified that, on the morning of December 28, she saw a man who carried a doctor's case enter the Sieverling residence and remain there about an hour, and that he left about 10:30. Another who lives two doors east testified that she saw the defendant at Sieverling's "about two years and a half ago," and since that time "on an average of every other day" and sometimes twice a day; that she saw him there on the 28th or 29th of December between 9 and 10, but did not know which day; that his car had the monogram "J. T. M.;" that he sometimes left his car in the Sieverling garage and generally stayed about two hours; that she saw Mrs. Sieverling ride in defendant's car several times; that four or five times she had "seen

them with young ladies in the car," but that she never saw young ladies come in the doctor's car without him or without Mrs. Sieverling. The evidence of another near neighbor was that, soon after the Sieverlings moved into their house, the interior was changed so that a person could go up-stairs "without going through the down-stairs part of the house;" that he saw defendant at the Sieverling house probably a hundred times in the last two years, and that when defendant parked his car in the rear at the garage he entered the house by the back door most of the time.

Mrs. Sieverling, on the part of defendant, testified that she and her husband and her grandson lived at 2602 Cuming street about three years; that defendant was their family physician for about 20 years, and that he was not at her house December 27 or 28, 1922. She denied that she ever knew Loretta McDermott or that she was ever at her house. Her evidence in respect to the number of times defendant called at her home in the past two years was evasive. Once she said 10 times, and again that it might have been 20 times or 25 times, and that he never stayed over 30 minutes. Mr. Sieverling and several other persons, said to be roomers at the house, testified that Loretta McDermott was not there December 27 or 28, nor at any time, nor was any person there answering her description. There was also some corroborative evidence by two witnesses in respect to defendant's testimony concerning the alleged visit at his office of a person who was said to have called himself a " Dr. Hansen." It may be added that on almost every material fact defendant introduced evidence opposed to that introduced by the state. The conflict, however, is more apparent than real, and, in our judgment, the jury were justified in so considering it. Anyhow, it is elementary that disputed questions of fact, and of the credibility of witnesses as well, are for the jury.

The defendant testified in his own behalf and denied practically all of the material evidence submitted by the state. He denied that he ever saw or heard of Miss McDermott, and testified that he was the family physician of the Siever-

lings; that Mrs. Sieverling had a chronic stricture of the bowel which required him to go frequently to her home; that he had no record and could not tell how many times he gave her treatments in the last two years; that he did not remember prescribing for other persons at her residence, nor that he ever treated any serious cases there; that a few days before his arrest he "called incidentally at her request to stop and see her new piano."

In respect to the $100 check, defendant testified that it was handed to him Friday, December 29, about 3 o'clock at his office by a stranger who said he was Dr. Hansen of Ainsworth, Nebraska, and that he had a patient who came to Omaha and he had advised her if she did not get along well to see defendant; that the stranger said, "She has been a little unfortunate and I think she is all over it, but I advised her if she had any trouble to see you," and that he, defendant, was to do whatever was necessary; that he told Hansen he would not guarantee hospital expenses, and that Hansen said he would leave her check with him, and if she needed any attention the patient would take up the check and pay her expenses therefrom; that she might come and get the check or he, Hansen, might send for it; that he, defendant, called a man in his office as a witness and said: "This is Dr. Hansen and he wants to leave a check in my care, and I want it understood that I have no interest in this check, that it is simply left with me however until the party to whom it belongs may come for it, the party that signed her name, or the party that the doctor may send for it·" that he called another man to come "where he could hear. I think he heard our conversation. It was open and above board." He testified that Hansen left and said he was going out of town. The witness gave a description which he said fitted Dr. Hansen and said he tried but failed to locate him.

In respect to Mrs. Henry's visit to his office and her testimony in regard to obtaining Miss McDermott's check, and the $25 in currency which she said she paid to defendant on the same date, defendant's version is that Mrs. Henry

came to his office, January 5, and told him she was a friend
ot the party who signed the check and that she was sent to
get it from him; that upon her assurance that she was en-
titled to receive it he handed it to her; that he refused to
endorse it, and she, for that reason, handed it back and
went away; that she returned later and he gave the check
to her; that, as she started for the office door, she put out
her hand as though to shake hands, and she "fumbled"
something into his hand; that a part of it "stuck in my hand
and part fell on the floor;" that she then rushed away and
he picked up the money which fell to the floor and called
Mrs. Henry and said: "This money does not belong to me,
I have no interest in that check, but she was gone and out
of hearing and out in the hall, and out of my sight anyway.
So I put the money in my pocket." From his evidence it
appears that immediately thereafter he was arrested.

Three newspaper reporters were called by the state in re-
buttal of some of the defendant's evidence. Albert Namen
represents one of the Omaha dailies. He testified that on
the day of the arrest defendant told him that Dr. J. R.
Howland gave him the $100 check with which to take care
of a sick patient, and that defendant said Miss McDermott
was the patient to whom Dr. Howland referred. Mr. Pat
Boyle, a newspaper reporter, testified that he was at the
Paxton Block about noon January 5, 1923, shortly before
defendant's arrest; that defendant was seated in his car at
the curb when he, the witness, arrived at the office build-
ing; that he saw him get out and go into the lobby and talk
with Mrs. Henry; that he heard him tell her to go up to his
office and that he would be there in about ten minutes; that
subsequently he talked with the defendant and was told by
him that the doctor from whom he obtained the check was
from the up-state country; that he got a $25 consultation
fee from Mrs. Henry for consulting with the doctor from
whom he obtained the check, and that he then thought Mrs.
Henry said she was the doctor's wife. Fred Durr is a police
reporter for an Omaha paper. He testified that he talked
with the defendant January 6, the day after his arrest; that

he asked him whether he knew the name of the doctor from whom he received the check, and was old that he did not; that defendant told him the $25 was tendered to him by a lady who wanted to obtain possession of the check on the ground that the patient had gone home, and that the $25 was a consultation fee from the doctor who first saw him in regard to his patient.

Defendant objected to the evidence of Dr. Henry and of Mr. Fleming, hereinbefore referred to, on the ground that it was repetitious and cumulative, and that all of the statements "were substantially to the same effect and were in reality all one," and that its effect upon the jury was much greater than if given only once by a single witness. The statements, however, were made separately by the declarant to both witnesses, while she was at the hospital and only two or three days after she made the dying declaration which was reduced to writing. And it is apparent that the evidence of Mr. Fleming, as reflecting Miss McDermott's declarations, contained material matter which is not found in the written declaration nor in Dr. Henry's evidence. From his evidence it appears that, after declaring she was going to die, she gave him the street number of the house where the operation was performed; that she went there alone; that he performed the operation alone; that he used instruments; that she paid $25 and gave her check for $100 for the balance. To Dr. Henry she said that she had not been given an anæsthetic. So that the evidence complained of was not repetitious.

Defendant's objection is not well taken. It is elementary that a dying declaration is admissible in homicide cases, and where a dying declaration has been received in evidence, under circumstances which make it proper to be so received, a subsequent statement may likewise be communicated to the jury without proof that it was made with knowledge of impending death, where it is so closely connected with the dying declaration, in point of time and substance, that it may properly be said to be a continuance thereof.

In respect of the competency of dying declarations an ac-

cepted authority says: "A proper predicate must be laid for the introduction of the declaration; it is generally a sufficient predicate to show, by the repeated assertions of the declarant, that he was about to die; it may be laid by showing that the surrounding circumstances were of such a character as to satisfy the court that the declarant believed that he would die; such belief is indicated by sending for a priest; religious expressions are often conclusive as showing his abandonment of hope; anxiety about his business affairs is an element of such predicate. In the absence of a statement in words of the declarant himself, it will be sufficient if the surrounding facts indicated that he was conscious of the certainty of his death. In aid of this, the court may take into the consideration the bodily condition of the declarant, his wounds, his conduct, his language, and his statements, and all facts from which a conclusion may be deduced of his consciousness of approaching dissolution at the time." 1 Wharton, Criminal Evidence (10th ed.) sec. 275c.

"Dying declarations, to be admissible in evidence, must be made under a sense of impending death. But it is unnecessary that the deceased should have stated at the time of making the same that he was about to die. It is sufficient if this state of mind appears from other testimony." *Fitzgerald v. State,* 11 Neb. 577. See *Rakes v. People,* 2 Neb. 157; *Collins v. State,* 46 Neb. 37. And in this state a dying declaration is admissible in a prosecution for homicide which results from procuring an abortion. On the latter point the subject is discussed in *Edwards v. State,* 79 Neb. 251, and the rule which is applicable to this class of cases is there stated at some length and authorities are cited in its support. Discussion of that subject is therefore unnecessary here. *Fields v. State,* 107 Neb. 91, is a case which involves an illegal operation wherein a letter, written by the victim shortly before death, and before the operation was performed, was received in evidence, but on the ground that it showed a conspiracy to commit an unlawful act and was therefore a part of the *res gestæ.*

Defendant offered four separate instructions, which were

Mathews v. State.

ι ʼfused, which in substance informed the jury, in differing forms of expression, but all of the same general import, that dying declarations "are not entitled to the same weight as evidence as sworn statements made from the witness-stand in open court, for the reason that the defendant has had no opportunity to cross-examine the witness, and you have not had the opportunity of seeing and hearing her testify and of observing her conduct and demeanor on the witness-stand."

The court did not err in its ruling. "It is proper to refuse to instruct that dying declarations are not entitled to the same weight as would be the testimony of deceased if he were a witness testifying in court, since it would be a comment on the evidence." *State v. Reed,* 137 Mo. 125. See, also, 1 R. C. L. 542, secs. 86, 87, 88 and 89. To the same effect is Hughes, Instructions to Juries, sec. 180, where it is added that "a charge that dying declarations should be received with great caution is likewise improper."

The court did not err in overruling defendant's motion for a new trial, nor was error committed in overruling the application for a new trial on the ground of newly discovered evidence. The verdict is clearly supported by the great weight of the evidence on every material point, and we are convinced that, even if the evidence of the affiants should be introduced by defendant on a retrial, it is not at all probable that the result would be changed. In *Kerr v. State,* 63 Neb. 115, we held: "It is not error to overrule a motion for a new trial on the ground of newly discovered evidence, where it does not appear that such evidence, if introduced on a retrial, would probably change the result reached on the first trial." To the same effect is *Ogden v. State,* 13 Neb. 436.

Other assignments of alleged error have been urged which we have considered but do not find it necessary to discuss nor to decide.

Reversible error does not appear in the record. The judgment is

AFFIRMED.