THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CEDRIC WEBB, a/k/a Little Gage, Defendant-Appellant.

First District (5th Division) No. 83—0067

Opinion filed March 30, 1984.—Rehearing denied May 29, 1984.

Howard T. Savage, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Kevin Sweeney, and Thomas Gearen, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MEJDA delivered the opinion of the court:

A jury found defendant, Cedric Webb, guilty of the offense of murder. The trial court entered judgment on the verdict, denied defendant's post-trial motion, and sentenced defendant to a term of 50 years in the custody of the Department of Corrections. Defendant appeals, raising four issues for review. First, defendant asserts that the trial court erred in admitting certain statements of the murder victim, John Griffis, concerning the identity of his assailant. Second, defendant contends that he was denied his constitutionally protected rights to due process of law and to confront the witnesses against him. Third, defendant argues that he was not proved guilty of murder beyond a reasonable doubt. Fourth, defendant raises another due process argument. For the reasons which follow, we affirm the judgment of the circuit court.

The nature of the defendant's contentions requires a rather extensive factual recitation. Before trial defendant made a motion *in limine* seeking to preclude the prosecution from introducing extrajudicial statements made by the victim. A hearing on the motion was conducted over several days and various witnesses testified. The testimony pertinent to our decision is recounted here.

Michael Magliano, a Chicago police officer, testified that he talked with Griffis several times in the emergency room of the hospital where Griffis had been taken after he was discovered in an alley with numerous bullet wounds. Magliano testified that he spoke with Dr. Parsis, who told him that "it didn't look good for John" and that he was being prepared for surgery. Magliano told Griffis that it didn't look good for him and that he had about a "50-50" chance of survival. Magliano stated that although Griffis did not know his assailant's real name, he did identify him as "Little Gage." At Griffis' instance, the police brought a friend of Griffis' to the hospital. Griffis, according to Magliano, told that person, "Chris, man, help them. Little Gage did me [*sic*] in."

Dolores Griffis testified that she is the victim's sister. She visited him at the hospital on May 21, 1982, which was two days after the shooting. Griffis could not talk at that time but could communicate by

hand signals and nods. About 11 a.m. the witness and Griffis' estranged wife were trying to talk with him when he began to gesture with his hands. The witness stated that he looked as though he were pulling the trigger of a gun, inasmuch as his index finger was straight out and his thumb was up. The trial court struck the witness' interpretation of the gestures but allowed the description to stand. The witness indicated that Griffis gestured three times, each time turning his head on the pillow and closing his eyes. His wife asked him whether he felt he was going to die, and Griffis nodded his head affirmatively and began to cry.

Daniel Swick testified that he is a detective with the Chicago police department. He visited Griffis about 5 p.m. at the hospital on May 21, 1982. The witness asked Griffis whether the latter was able to talk and Griffis replied with a negative shake of the head. Swick asked whether Griffis could answer "yes" or "no" and Griffis nodded affirmatively. Swick had five photographs with him and showed three of them to Griffis.

John Ryan, a detective with the Chicago police department, testified that he was with Swick at the hospital and that Griffis nodded his head up and down when he was shown the third photograph. Ryan asked whether he was positive that it was the man who shot him and Griffis nodded his head up and down.

The trial court allowed the defendant's motion *in limine* with respect to one specified statement and denied the motion otherwise.

The evidence at trial established that on May 19, 1982, at about 11:15 p.m. John Griffis was shot six times in the back and side in an alley behind 132 West 103rd Place in the city of Chicago. Ronald Redmond testified that he was on a nearby sidewalk at the time and heard five or six gunshots in rapid succession. He observed the defendant, whom he knew only as "Gage," walk out of the alley, where he was met by a grey and black automobile driven by another man whom the witness knew only as "Jungle Bunny." Upon entering the vehicle, the defendant bent down so that he could no longer be seen. The vehicle then drove away. On cross-examination Redmond testified that the area was well illuminated by street lights. He admitted that he did not report any of his observations to the police until the next night, when the police came to question him about the shooting. On redirect examination Redmond stated that he was appearing pursuant to a subpoena and in exchange for an airplane ticket to Los Angeles.

Stan Salabura testified that he is a patrolman with the Chicago police department and was on duty at 11:15 p.m. on May 19, 1982. He

indicated that along with Officers Magliano and Van Dixon, he responded to a call concerning the shooting. When Salabura arrived at the scene, an elderly man motioned to him to show where the injured man could be found. Salabura discovered Griffis in the alley. He was bleeding and moaning and calling for help. In answer to the officer's inquiry, the victim stated that his name was John. The policeman asked him "John, do you know who shot you?" Salabura testified that the man responded, "Little Gage." After an ambulance arrived, Salabura once again asked who had shot him and again received the reply, "Little Gage." In an unsuccessful search for the murder weapon, Salabura discovered seven spent .380 shells and one spent bullet.

Officer Michael Magliano testified that he went to the alley and observed two blood stains on the pavement and several expended .380 casings. He and Officer Salabura went to the Roseland Community Hospital emergency room and spoke to Griffis. He was conscious at the time but was bandaged and attached to IV's. Salabura was not present for the entire conversation with Griffis but did ask Griffis who had shot him and was told "Little Gage." He asked Griffis why he had been shot and Griffis replied that Little Gage had tricked him in the alley and that it had something to do with Griffis' girlfriend. Magliano asked whether there was anyone who could help the police to find Little Gage and Griffis referred them to Chris Taylor. Magliano found Taylor and brought him to the emergency room. There Magliano talked with a doctor and informed Griffis that he had about a "50-50" chance of survival and that "[it] doesn't look good for you." At this point, Magliano testified, Griffis raised himself up on the gurney and said to Taylor, "Chris, Little Gage did me, man, help him out. Help me get him." Taylor took two officers to Cedric Webb's house, but Webb was not there. Magliano testified that he arrested Webb at the courtroom located in the police headquarters building the following day and identified defendant in the instant trial as the man he arrested.

On cross-examination defense counsel asked Magliano whether he thought that it was odd that a person who shot someone not 12 hours previously would appear at a police headquarters. Magliano indicated that he did not. On redirect examination, Magliano stated that the reason that defendant was arrested at the courtroom at police headquarters was that defendant had accompanied "Jungle Bunny" to his court date. Magliano identified "Jungle Bunny" as James Jenkins.

John Burt testified that he lives in the same neighborhood as Griffis and defendant and that he knew defendant as "Little Gage" and did not know his real name. On cross-examination, he stated that he

knows some people by their real names, some people by nicknames, and some by both.

Dr. Tae An testified that he is a pathologist and the parties stipulated that he is an expert in that field. He testified that on May 28, 1982, he performed an autopsy on John Griffis and determined that death was caused by various bullet wounds to the chest and abdomen, lacerating vital organs.

Dolores Griffis testified that John Griffis was her younger brother. She and Griffis' estranged wife LaVerne visited him in intensive care at the hospital on May 21, 1982, at about 11 a.m. Griffis was in bed and various machines, IV's and tubes were connected to his body. He was conscious and his eyes were open. LaVerne asked him who had shot him but he was unable to speak or write an answer. He did make a sign with one hand, indicating a gun, with his thumb up and his index finger out. LaVerne asked whether he thought that he was going to die and Griffis nodded his head to indicate "yes," and then began to cry. On cross-examination, she stated that Griffis had not been administered any sedatives.

Charlene Hines testified that she was Griffis' girlfriend and lives just off of the alley where Griffis was found. Her bedroom and living room overlook the alley. On May 19, 1982, she heard several sounds like gunshots coming from the alley. She waited a few seconds and then called the police. She testified that she recognized Griffis' voice, hollering that he had been shot. A "little bit" later the police arrived. She thereafter exited her home and observed two milk crates stacked under her bedroom window.

Daniel Swick testified that he is a detective with the Chicago police department. On May 21, 1982, he and Detective John Ryan took five photographs, including that of defendant, to Roseland Hospital to show to Griffis. Swick testified that he informed Griffis that he was a police officer and asked whether Griffis could talk. Griffis shook his head to indicate that he could not. Swick testified that he showed Griffis the photographs and asked whether Griffis could identify the man who had shot him. Griffis nodded "no" to the first two photographs but nodded "yes" to the third. Swick stated that defendant is the same man as depicted in the photograph which Griffis picked out. On cross-examination Swick denied telling Griffis that the picture was supposed to be "Little Gage" and stated that he had never heard that nickname in his conversations with other police officers.

Michael Bosco testified that he is a Chicago police department detective. On May 22, 1982, at 11 a.m., he and his partner, Detective Huffman, were at the Area 2 police offices. Bosco stated that he ad-

vised defendant of his *Miranda* rights and that defendant indicated that he understood them and agreed to answer questions. Bosco testified that defendant asked the detectives whether they had gone to the crime scene and whether they had seen the milk crates. Bosco stated that defendant indicated on a diagram where the milk crates were located and that this corresponded to the location where Griffis was found. Defendant's only explanation for this knowledge was, according to Bosco's testimony, that "I just know." Defendant's explanation for Griffis' accusation of defendant was that Griffis was supposedly involved in the homicide of Reginald McGee, a close friend of defendant. Defendant stated that "everyone knew" that when defendant returned to the neighborhood he would avenge the death of his friend. Bosco stated that he had investigated the relevant police reports and that they supported defendant's assertion that a Reginald McGee had been a homicide victim. Bosco was later recalled for further direct testimony and stated that Reginald McGee is actually alive, and though he had been shot in the head he recovered from his wounds.

The prosecution then rested its case. After the trial court denied defendant's motion for a directed verdict of acquittal, the defense presented its testimony.

Margaret Webb testified that she is defendant's mother. On May 19, 1982, she was home with five of her six children. Defendant left the home about 8 p.m. and returned close to 10 p.m. and then left again. He called about 1 a.m. and said that he would be out late. The police arrived about 15 minutes later and asked about someone named "Gage." The witness testified that she does not know anyone with that name and that the only nickname for defendant of which she is aware is "Renegade." On cross-examination, Mrs. Webb stated that defendant knows James Jenkins.

Yvette Martin was an alibi witness for defendant. She stated that on May 19, 1982, defendant spent the evening with her on her front porch. He was there from 10 p.m. until about 2½ hours later and did not leave at any time. She did not see him with any kind of weapon. On cross-examination, she admitted that she did not tell anyone except defendant's mother that he was with her at the time of the murder after she learned that he had been arrested. On redirect examination, she stated that defendant's attorney had advised her not to talk with anyone about the case.

James Jenkins testified that he has known defendant for 10 to 12 years. Jenkins stated that he himself has been known by the nickname of "Jungle Bunny" but has not been called that for at least 12 years. On May 20, 1982, Jenkins had to appear in a courtroom at po-

lice headquarters. He was accompanied by defendant because Jenkins wanted someone to take his car if he, Jenkins, was incarcerated. Defendant was arrested as he left the court. On cross-examination, Jenkins identified defendant in the photograph which Griffis had designated as that of his attacker. He also admitted that he drives a grey and black Mercury.

Detective Bosco was called to testify and stated that on May 20 and 21, 1982, he was told that Griffis was sedated and was lapsing in and out of consciousness. On rebuttal for the prosecution Bosco testified that defendant gave the police the following account of his whereabouts on May 19, 1982: he spent most of the day with Jenkins, then went home around 5 p.m. He was in and out of the house the rest of the evening and came home about 11 p.m. and stayed for about 20 minutes before going to Alonso Bennett's house. Jenkins picked him up there and he spent the night in a high rise building near 52d and State streets.

After being instructed by the court, the jury returned a verdict finding defendant guilty of murder. The defendant's post-trial motion was denied on December 11, 1982, and defendant was sentenced to 50 years' imprisonment. This appeal followed.

OPINION

■ Defendant first asserts that the trial court erred in admitting into evidence certain hearsay statements made by John Griffis to the police and to other people. The first of these statements occurred in the alley about 11:15 p.m. just after Griffis had been shot. A police officer asked Griffis, "John, do you know who shot you?" and Griffis replied "Little Gage." " 'Hearsay evidence is testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.' " (*People v. Carpenter* (1963), 28 Ill. 2d 116, 121, 190 N.E.2d 738, quoting McCormick, Evidence sec. 225, at 460.) Griffis' statement is hearsay under this definition as it was offered to prove that which was asserted, *i.e.*, that "Little Gage" had shot him. The statement therefore is not admissible unless it meets one of the myriad exceptions to the hearsay rule.

■ The State asserts that the statement is admissible under the "spontaneous declaration" or "excited utterance" exception to the hearsay rule.

" 'When a declaration is made under the immediate influence of the occurrence to which it relates and so near in time as to

negative any probability of fabrication, said declaration is admissible.' [Citation.]

Three factors are necessary to bring a statement within this exception to the hearsay rule: (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence." *People v. Poland* (1961), 22 Ill. 2d 175, 181, 174 N.E.2d 804.

■ The supreme court has held that there must be "some evidence of the existence of an occurrence sufficiently startling to produce a spontaneous and unreflecting statement ***." (*People v. Leonard* (1980), 83 Ill. 2d 411, 418, 415 N.E.2d 358.) This requirement is satisfied by the testimony from Officer Salabura concerning Griffis' condition when discovered in the alley. Further, it has been held that a gunshot wound is sufficiently startling to produce an unreflective response. (*People v. Kelley* (1963), 29 Ill. 2d 53, 60, 193 N.E.2d 21.) The police officer's question, "John, do you know who shot you?" does not destroy the spontaneity of Griffis' statement. (*People v. Damen* (1963), 28 Ill. 2d 464, 472, 193 N.E.2d 25; *People v. Sanchez* (1982), 105 Ill. App. 3d 488, 491, 434 N.E.2d 395; compare *People v. Taylor* (1971), 48 Ill. 2d 91, 96-97, 268 N.E.2d 865 (persistent questioning by fireman held sufficient to destroy spontaneity).) The second element, absence of time to fabricate, is satisfied by our review of the evidence, which indicates that Officer Salabura arrived on the scene within a few minutes of the shooting. In light of Griffis' being shot six times, a few minutes seems to us insufficient to allow an opportunity for reflection and invention. (See *People v. Robinson* (1978), 73 Ill. 2d 192, 199, 383 N.E.2d 164.) Finally, the statement clearly relates to the circumstances of the startling occurrence. Whether a statement is sufficiently spontaneous to qualify for admission into evidence under this exception to the hearsay rule is a preliminary question for the trial court (*People v. Grover* (1983), 116 Ill. App. 3d 116, 120, 451 N.E.2d 587), and in light of the foregoing circumstances we cannot say that its determination was error.

■ Whether Griffis' statements identifying "Little Gage" as his assailant made after the ambulance arrived in the alley and those made in the hospital emergency room qualify as "excited utterances" independently need not be determined, as these were merely cumulative of the statement already admitted, and we find them harmless beyond a reasonable doubt. (*People v. Sanchez* (1982), 105 Ill. App. 3d 488, 492, 434 N.E.2d 395; *People v. Vinson* (1977), 49 Ill. App. 3d 602, 607, 364 N.E.2d 364.) However, the photographic identification

presents a different problem because the admission of Griffis' identification of defendant's photograph cannot be said to be merely cumulative of admissible evidence. The State argues that this identification is admissible under the "dying declaration" exception to the hearsay rule.

As stated in *People v. Tilley* (1950), 406 Ill. 398, 403-04, 94 N.E.2d 328:

> "The law with respect to dying declarations has been firmly established in this State. They are defined as statements of fact by the victim, concerning the cause and circumstances of a homicide \*\*\*. To make them admissible into evidence as dying declarations, and as an exception to the rule against hearsay evidence, it must appear that they are made by the victim under the fixed belief and moral conviction that death is impending and certain to follow almost immediately, without opportunity for repentance and in the absence of all hope of avoidance, when he has despaired of life and looks to death as inevitable and at hand. [Citations.] In *People v. Corder*, 306 Ill. 264, the fact that the declarant did not die until four days after making the statement, was held not to change the rule. It is the state of mind of the deceased and not that of any other person, which determines admissibility. [Citations.] The declarant must be in possession of his mental faculties sufficiently to understand what he is doing and to be able to give a true and correct account of the facts to which the statement relates. [Citation.] \*\*\* Courts will look to all the facts existing and surrounding the party giving the dying declaration at the time, before and after the declarations are made forming the *res gestae* and tending to show his true state of mind. [Citation.] Finally, the court, upon a preliminary hearing outside the presence of the jury, must first be convinced beyond all reasonable doubt that all the elements of a true dying declaration are present, before such statements may be heard and considered by the jury."

The trial court's determination of whether a particular statement constitutes a dying declaration will not be reversed on appeal unless its findings are palpably contrary to the manifest weight of the evidence. (*People v. Rhoads* (1982), 110 Ill. App. 3d 1107, 1120, 443 N.E.2d 673.) The People argue that the evidence was sufficient to allow the trial court to conclude that John Griffis was under the fixed belief and moral conviction that death was impending and inevitable.

As *Tilley* indicates, a court will look to all the facts and circumstances surrounding the supposed dying declaration, including

those at the time of its making as well as before and after. In *People v. Broughton* (1976), 35 Ill. App. 3d 619, 624-25, 342 N.E.2d 100, the victim's statement that "I am in pain, I am in pain, I am dying," which was made at her home, was held sufficient foundation for the introduction of a statement implicating the defendant which was made later at the hospital. In the instant case, Dolores Griffis' testified that at 11 a.m. on May 21, 1982, John Griffis indicated his belief that he was going to die. Between 5 p.m. and 6 p.m. Griffis picked defendant's photograph out of a photographic array. Defendant contends first that Griffis' nod is an insufficient basis for the court to have concluded that he was aware of his eminent demise, citing *People v. Odum* (1963), 27 Ill. 2d 237, 188 N.E.2d 720. As the court noted in that case, however, the wounded man never gave any positive indication that he was aware of the seriousness of his condition. In the instant case, the defendant indicated positively that he believed that he was dying. " 'Any adequate method of communication, whether by words or by *signs* or *otherwise*, will suffice, provided the indication is positive and definite, and seems to proceed from an intelligence of its meaning ***.' " (*People v. Scott* (1972), 52 Ill. 2d 432, 438, 288 N.E.2d 478, *cert. denied* (1973), 410 U.S. 941, 35 L. Ed. 2d 607, 93 S. Ct. 1406, quoting 5 Wigmore on Evidence sec. 1445, at 245 (3d ed. 1940).) That Griffis' gestures were calculated communication was established by the context in which they were made: his wife inquired whether he thought that he would die and he nodded his head affirmatively and began to cry. Thus, the trial court could properly have concluded that Griffis positively manifested his state of mind and that Griffis was aware of the content of his communication. But this was not the only circumstance which could justify the trial court's ruling. In looking at all of the facts and circumstances, it has been held proper to consider the grievous nature of the declarant's wounds as justifying the conclusion that he must have known of the seriousness of his condition. (*People v. Selknes* (1923), 309 Ill. 113, 119, 140 N.E. 852; *People v. Barnes* (1983), 117 Ill. App. 3d 965, 970, 453 N.E.2d 1371 (declarant shot at close range with a shotgun); *People v. Rhoads* (1982), 110 Ill. App. 3d 1107, 1119, 443 N.E.2d 673 (declarant doused with gasoline and set afire).) In *People v. Thomas* (1977), 49 Ill. App. 3d 961, 971, 364 N.E.2d 641, the court apparently recognized this rule but nonetheless held that the absence of some direct evidence that the declarant considered himself to be *in extremis* precluded the court from concluding that he was aware of his condition. In the instant case, there was direct evidence of declarant's state of mind, which was that he indicated that he thought that he was going to die.

Thus, the trial court could properly have considered Griffis' six gunshot wounds in determining whether Griffis was aware of his impending death. Further, we believe that in light of all of these circumstances the trial court was justified in concluding that Griffis was aware of his impending death at 11 a.m. on May 21, 1982. Contrast the instant case with *Westbrook v. People* (1888), 126 Ill. 81, 90-91, 18 N.E. 304, where all of the circumstances did not necessarily mandate the conclusion that the declarant must have been aware of his impending demise: the wound was not necessarily fatal, declarant did not avail himself of the opportunity to take care of business affairs, and his condition was relatively stable at the time of making his statement.

Defendant asserts that while Griffis may have been aware at 11 a.m. on May 21, 1982, that he was on the brink of death, there is no indication that this state of mind persisted until 6 p.m. when he picked defendant's photograph out of the array. Whether a declarant's *expression* of resignation to his fate must coincide with the declaration in question has not been directly addressed, so far as we have been able to determine, by the courts of this State; however, it is well established that declarant must possess the requisite state of mind simultaneously with his statement. (*People v. Selknes* (1923), 309 Ill. 113, 119, 140 N.E. 852.) The rule among the several States is not uniform. (See Annot., 53 A.L.R.3d 785, 819-20 (1973).) Illustrative of one line of authority is *State v. Sadler* (1899), 51 La. Ann. 1397, 1426, 26 So. 390, 401, in which a dying declaration made 24 hours previously was held to be an insufficient foundation for establishing the declarant's belief of his imminent death so as to qualify an identification of the defendant as a dying declaration. This line of authority has been criticized by an eminent authority as "narrow and over-cautious." (5 Wigmore on Evidence sec. 1442, at 298-300 (Chadbourne rev. 1974).) Another approach was taken in *Mathews v. State* (1924), 111 Neb. 593, 197 N.W. 602, where an oral statement implicating the defendant but failing to indicate knowledge of impending death was made three days after a valid written declaration. The court held the subsequent statement to be admissible as made with the requisite awareness of impending death because it was "so closely connected with the dying declaration, in point of time and substance, that it may properly be said to be a continuance thereof." (111 Neb. 593, 603, 197 N.W. 602, 606.) This view proves unsatisfactory as well, however, since it provides no meaningful analytical framework with which to determine the declarant's state of mind at the time of the statement. In our view, no special rule need be formulated for cases such as this where

the identification of defendant is not made contemporaneously with the declarant's expression of his state of mind. Instead, this fact is merely one circumstance for the trial court to consider in its determination that such a state of mind did in fact exist at the time the statement was rendered. (See *People v. Broughton* (1976), 35 Ill. App. 3d 619, 624-25, 342 N.E.2d 100.) In the instant case, these circumstances include the grievous nature of declarant's wounds (see, *e.g., People v. Barnes* (1983), 117 Ill. App. 3d 965, 970, 453 N.E.2d 1371), the lack of any evidence that his condition had improved in the interim (see *People v. Selknes* (1923), 309 Ill. 113, 119, 140 N.E. 852; compare *Westbrook v. People* (1888), 126 Ill. 81, 90-91, 18 N.E. 304; *Batten v. Commonwealth* (1949), 190 Va. 235, 56 S.E.2d 231), and the short period which elapsed between the expression of his belief in his imminent death and the subsequent photographic identification. We conclude that these circumstances are sufficient for the trial court to have concluded that declarant was in fact aware of his impending demise at the time that he identified defendant's photograph as that of his attacker.

■■ The next requirement is that declarant be in possession of his mental faculties sufficiently to understand what he is doing and to be able to give a true account of the facts. (*People v. Tilley* (1950), 406 Ill. 398, 403, 94 N.E.2d 328.) The evidence at trial indicated that declarant understood the questions of the detective and that he was able to communicate intelligible answers. Additionally, the trial court could well have concluded that declarant was not under the influence of drugs, although the evidence was in conflict on this point, and that he was sufficiently in possession of his faculties to attempt to pantomime shooting a gun and dying. These facts provide an ample basis for the trial court's implicit finding that declarant was able to understand what he was doing and to render an accurate account. We conclude that the trial court, which was in a better position to determine this question than is a court of review, properly admitted declarant's identification of defendant's photograph as a dying declaration.

■■ Defendant next contends that he was not proven guilty beyond a reasonable doubt. This contention is without merit. In addition to the dying declarations of the victim, which, with the testimony establishing "Little Gage" as defendant's nickname, implicated defendant as the murderer, circumstantial evidence also points unswervingly to the defendant. Ronald Redmond testified that he heard several shots, saw defendant walk out of the alley and get into a grey and black vehicle driven by the man later identified as James Jenkins. Jenkins testified that he drives a grey and black automobile and that

he and defendant are friends. Detective Bosco's testimony, if believed, would seriously have undermined the alibi defense. On appeal, a court of review will consider the evidence in its aspect most favorable to the party prevailing below and will not reverse a conviction in a criminal case unless the evidence is so improbable as to justify a reasonable doubt of the accused's guilt. (*People v. Waters* (1976), 47 Ill. App. 3d 948, 953, 362 N.E.2d 1157.) The State's evidence was not inherently improbable, and we believe from our review of all of the evidence adduced at trial that defendant was proved guilty beyond a reasonable doubt.

 Defendant's constitutional arguments are similarly without merit. He contends that his conviction, procured by the evidence admitted pursuant to the dying declaration rule, violates his sixth amendment right to confront the witnesses against him. This question has been settled to the contrary. See *Pointer v. Texas* (1965), 380 U.S. 400, 406-07, 13 L. Ed. 2d 923, 928, 85 S. Ct. 1065, 1069.

Defendant's final due process argument is likewise based on his assertion that the admission of Griffis' dying declarations violates his right to confront the witnesses against him. As indicated already, defendant's confrontation rights have not been violated.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

LORENZ and SULLIVAN, JJ., concur.