CHARLES PENN v. STATE OF NEBRASKA.

FILED NOVEMBER 8, 1929. No. 26977.

*J. H. Grosvenor, E. J. Patterson* and *P. S. Heaton,* for plaintiff in error.

*C. A. Sorensen, Attorney General,* and *Clifford L. Rein, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, THOMPSON, EBERLY and DAY, JJ.

GOSS, C. J.

The defendant, Charles Penn (often called Pete), was convicted of murder in the first degree and the verdict of the jury fixed the penalty at life imprisonment. From a judgment thereon the defendant comes here on proceedings in error.

. Charles Johnson died at a hospital in Columbus about 4:30 o'clock on the morning of October 4, 1928, as a result of a pistol shot or shots received by him about 11 o'clock on the night of October 2, 1928, at his blacksmith shop and public garage at Clarks. The defendant made his

home with his widowed mother, who lived in the same block in which Johnson conducted his business. Johnson and his blacksmith, Fred Hanson, lived in quarters on the second floor of Johnson's place of business, directly over the office. Penn and Johnson were friendly and Penn had long frequented Johnson's place and had opportunity to know that Johnson at times kept considerable sums of money about his office. In 1925 Penn had been convicted of breaking and entering and had served for a time in the penitentiary but had been paroled in October, 1927, to a farmer named Gerber, living near Clarks, and had been finally discharged in May, 1928. Mr. Gerber having died, the defendant continued to work for Mrs. Gerber. However, for the last six weeks he had not worked much, having had influenza.

Johnson was about his place of business on the afternoon involved and traded his used car for another and $25 in cash, with a customer, late in the afternoon. They celebrated the trade with a drink or two of liquor. He took his supper at Mrs. Penn's with Charles and others and later at night he and others went to this home and partook of an oyster stew. There was some drinking there in which Johnson and Penn probably participated. The testimony does not seem to show that either was intoxicated. Penn had no money and was given money by his mother to procure crackers for the feast. The defendant and his brother-in-law left the Penn home after the oyster supper at some indefinite time before 11 o'clock and Johnson left soon thereafter. At about 11 o'clock Johnson was wounded in his place of business. He received from a direction in front of him two shots from a 32-calibre pistol in his left arm and from the rear a shot entering on the left side of the spine and taking a course inward and upward through the abdomen but not leaving the body. Under the direction of Dr. R. R. Douglas of Clarks he was taken to a hospital at Columbus, where he arrived about midnight of the night of the shooting, and died about 4:30 in the morning of October 4, 1928.

The evidence shows that Johnson died from the effect of the bullet wound in the abdomen and that no pistol was found. As to the shooting, there is no direct evidence against Penn by any eye-witness, except as found in the statements of Johnson made, as argued by the state, under the sense of impending death. Plaintiff in error complains that these declarations were erroneously admitted in evidence.

Between 8 and 9 o'clock of the evening of October 3, 1928, being seven or eight hours before his death, Johnson signed in pencil a dying declaration, written in ink on two sheets of paper of letter size; in the handwriting of Emil F. Luckey, the county attorney of Platte county. Mr. Luckey testified that he had heard Dr. Morrow of Columbus, who attended Johnson at the hospital, inform Johnson that he could not survive and heard Johnson answer, "I am sorry but I guess you have done all you can for me." Mr. Luckey further testified:

"A. Well, I then asked Mr. Johnson if he had understood what Dr. Morrow had told him and he said he did, and then I asked him 'You realize that you are not going to live?' and he stated he did, and I told him, 'I have a statement here, Mr. Johnson, of the facts as they occurred last night of the shooting, given to me by Mr. Hawkins, and I would like to have you read them and, if they are correct, sign them.' And I then further told him, 'Would you rather have me read it for you and if there are any corrections you can give them to me?' and he stated that he would rather have me read the statement to him. I then proceeded to read the statement and I read it to him sentence by sentence and stopped at the end of each sentence and asked him if it was correct, and I don't recall, he made one or two corrections or changes in the statement and at the end of the statement I asked him, 'Is the statement, as you have corrected it, a correct statement now? and he said it was. And I asked him to sign it and he did. Dr. Morrow and myself signed the statement.

"Q. During this time, what did you observe as to Mr. Johnson's mental condition?

"A. Well, his mental condition seemed to be good. He was responsive to all questions. He was very responsive to the questions."

The written statement, being state's exhibit 1, follows:

"I Charles H. Johnson, having been advised by Dr. Frank Morrow that I will not recover from the bullet wounds I received Tuesday night, October 2, 1928, when I was shot by Charles Penn and myself fully realizing that death is at hand do hereby make this the following as a true statement of the facts concerning the shooting and my death:

"About 8:30 Tuesday evening October 2, 1928, I went over to the Penn home and was invited to partake of an oyster stew. Mollie Penn, Hiram Jones, Mark Lamb, Virgil Bane and Charles Penn were present at the oyster stew. Later Charles Penn, Virgil Bane and Mark Lamb left the house, leaving myself, Mollie Penn and Hiram Jones in the house. Soon following this I left and went to my garage and as I approached I saw Charles Penn's face through the window very clearly by the light of the office which I had turned on, searching through my office. I said to him, 'What are you doing there?' but he did not respond but ducked behind a brick flu located in the center of my office room. I pondered for a moment and thought that he might have got out the back way. Then I proceeded to unlock the front door, having been on the outside thus far, went in and proceeded to the corner of the flu when Charles stepped out with a revolver in his hand and I said to him again, 'What are you doing here, Pete? and no answer but he fired two shots in succession which struck me in the arm. I immediately turned to go out the door and upon turning another shot was fired which struck me in the back. I kept going the best possible and I heard another shot fired which did not hit me. I got to the corner of the Farmers Union Oil Station and Charles Penn was in my doorway and called to me, 'Come back here Charlie,' and I said, 'No; you will shoot me again,'

and he said, 'No; I .wont.' I went back and he said, 'Charlie dont send me to the penitentiary,' and I said, 'No,' thinking he would shoot me again. He went to the telephone and called Dr. Douglas. When Charles fired the first two shots at me which struck my left arm I was standing only a few feet away from him and the lights were on and I could see him very plainly.

"(Signed) C. H. Johnson.

"(Signed) Emil F. Luckey.

"(Signed) F. H. Morrow."

The only changes Johnson caused to be made in the paper as first written by Mr. Luckey were three: First, they struck out the words "his own flash light" and interlined in lieu thereof the words "the office which I had turned on" after the words, still appearing, in the text "clearly by the light of." Second, they struck out the words "and turned on the light" after the words "went in" so that the text now reads "went in and proceeded to the corner of the flu (e) when Charles stepped out with a revolver in his hand." Third, there was another change by striking out five words, but it is inconsequential as they were an obvious repetition of five identical words, as often happens in writing by hand, as it often happens in using the typewriter, or occasionally may be seen in the use of the linotype.

Dr. Morrow testified that, in his opinion, at the time the document was read to the patient, his mind was clear. At other places in the record he expressed the opinion that Johnson was "perfectly rational," that he was not delirious although he had at that time a temperature of "101 and a fraction," that he was not suffering much pain at the time the statement was read to him, and that, while he was weak, the doctor did not think that "signing the statement made him very much more fatigued."

Plaintiff in error criticizes the admission in evidence of the written declaration because it was first reduced to writing on information furnished to the scrivener by another than the declarant and because of the effect of the

changes made and the consequent alleged inconsistencies in relation to the lights by which Johnson first identified his assailant at the office. These matters went to the weight and value of the evidence and were arguable to the jury with more force than to us. The chief purpose of the declaration was to identify the defendant. Quite independent of these items the statement contains evidence of identity to be considered by a jury along with other evidence. There is some corroboration of a portion of the declaration by a neighbor who was wakened by the shots on the fatal night. Henry A. Daniels, who lived across the street, heard the last two shots, listened and looked, finally saw two men, one of whom was Johnson and whose voice he recognized, walking toward the office, saw them go in and saw Johnson sit down in the chair with his left arm held out.

While sitting in the car, waiting to start from Clarks to Columbus, Johnson told Dr. Douglas and Kenneth L. Howe, the town marshal, who shot him. On the trial an objection to the doctor stating what Johnson said was sustained. When Howe was on the stand a like objection was sustained. But Howe gave without objection the following testimony as to what occurred about an hour after the shooting and shortly after Sheriff Curry had put the defendant under arrest: "Q. What did you say to the defendant at that time? A. I said to him, 'Mr. Johnson told me you shot him.' Q. And did the defendant say anything? A. Yes, sir. Q. What did he say? A. He said: 'That is it, Ex-convict. Take it all.'"

In *Edwards v. State*, 113 Neb. 698, the dying declaration was prepared in narrative form, read to the victim of an illegal operation and signed by her. We affirmed the action of the district court in receiving it in evidence over objections similar to those involved here. In that case we held:

"The admission of a dying declaration is, primarily, a question to be determined by the nature of each case.

"The law looks to the substance rather than to the form,

and it does not require that dying declarations must be made in any prescribed form or manner.

"Where dying declarations have been admitted in evidence, their weight and credibility are for the determination of the jury."

Substantially of the same nature and effect, in a case where a short written statement was prepared for another and signed by her, is *Mathews v. State,* 111 Neb. 593.

In a murder case, resulting in a conviction of manslaughter, we held: "In a prosecution for murder, the admissibility of a statement by the victim of the homicide that he was shot by defendant is a question of law for the court;" that the statement "may be admitted in evidence, if made under a sense of impending death, and the foundation for its admission may be shown by circumstances;" and "the time elapsing between the making of a dying declaration and dissolution is not necessarily a factor in determining the admissibility of the declaration as evidence." *Johnson v. State,* 112 Neb. 530.

It is needless to cite further authorities. These are recent and controlling. So, on this phase of the record, which is the chief point argued by the defendant, we hold that there was a proper foundation for the dying declaration, and its effect was for the jury to determine.

Complaint is made because the defendant was refused a change of venue. In the argument he relies upon *Olsen v. State,* 114 Neb. 112, wherein we reversed the judgment, with directions to grant a change of venue. There the record that the public sentiment of the community was aroused and that a general feeling of hostility against the defendant existed. We have examined the record and find that it shows no such condition here. The matter of granting a change of venue came under the well-established rule that it rested in the sound discretion of the trial court. We do not find that this discretion was abused.

The trial began on December 3, 1928. On December 7, 1928, as shown by the journal (on December 6 as indicated by a parenthetical note made by the reporter at a later

time in the bill of exceptions), it appeared that one of the jurors was ill. At the suggestion of the court the personal physician of the juror and the county physician examined him and reported him to be "on the edge of pneumonia and cannot possibly serve today and may not be able to serve for a week or ten days." Thereupon, under section 10150, Comp. St. 1922, the court carefully admonished "the jury as to its duties and the trial is adjourned to such time as the juryman recovers." The recovery of the juror took longer than had been anticipated, but on January 2, 1929, the juror had recovered and all parties reconvened to continue the trial. The court gave each party an opportunity to examine the jury. Thereupon let the record show what took place:

"Court: Does the defendant care to further examine the jury?

"Mr. Grosvenor: The defendant, Charles Penn, here objects to the resumption of argument and trial of this case at this date, to wit, January 2, 1929, for the reason that an unreasonable adjournment and delay has been occasioned during which time the jurors and each and all of them have been at large and outside the supervision and control of the court and in contact with the public generally, and have had means of and have acquired knowledge, information and other evidence of public opinion and expressions of other persons with reference to the status of the trial and the probable outcome thereof, all of which is highly prejudicial to the defendant and is calculated to deprive him of a fair and impartial trial such as is guaranteed by the Constitution and laws of the state of Nebraska.

"Court: Unless the defendant should examine the jury and it should appear that some prejudice has or would result, why, the motion will be overruled.

"Mr. Grosvenor: We don't care to examine.

"Court: The motion is overruled."

We have found no case identical with this, but *Ossenkop v. State,* 86 Neb. 539, is analogous in principle. This was

a manslaughter case. The point is well stated by the syllabus, as follows: "After the state had made its case in chief in a prosecution for murder in the second degree, an order permitting the jury, upon being admonished, to separate for the period of 21 days during a postponement allowed on the ground that four of defendant's witnesses had been quarantined on account of smallpox, *held* not an abuse of discretion or reversible error, where the record failed to show misconduct on the part of any juror or prejudice to defendant."

The record fails to show prejudice in this aspect of the case, and that portion of it which we have quoted shows no attempt on behalf of defendant to ascertain whether any juror had been contaminated during the recess. To reverse the judgment of a trial court on such a point would be destructive of the exercise of that independent discretion of the trial judges which seems to have been used with fairness in this instance.

The information contained two counts. The first charged murder in the first degree while attempting to perpetrate a burglary and the second charged conventional murder in the first degree. Error is asserted because the court refused to require the state to elect to proceed on one or the other count, and because in the first instruction given to the jury he submitted both counts to the jury. The overt acts necessary to prove ordinary murder and to prove the felony while attempting to commit burglary were the same up to the point of the said intent. Where different criminal acts constitute parts of the same transaction, they may be joined in the same indictment or count thereof. *Aiken v. State*, 41 Neb. 263; *Blodgett v. State*, 50 Neb. 121; *Zediker v. State*, 114 Neb. 292.

The defendant has set out a large number of assignments of error. We have treated those which seem to merit discussion. We have examined the others and do not deem them of sufficient importance to the parties involved nor to the profession to warrant so prolonged an opinion as would be required in their discussion. We do not find them meritorious.

On the whole we are of the opinion that the defendant had a fair trial and that the record is without prejudicial error.   The judgment of the district court is right and is

AFFIRMED.