(No. 21180.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM DAVOLIO *et al.* Plaintiffs in Error.

*Opinion filed June 24, 1932.*

MARTIN M. WARD, PHILIP SONNENSCHEIN, JOHN HETH, and ABRAHAM JOHNSON, for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, and GRENVILLE BEARDSLEY, of counsel,) for the People.

Mr. JUSTICE ORR delivered the opinion of the court:

William Davolio, Mike Sardone and Tony Riccio, plaintiffs in error, with Joe Russo, were indicted and tried in the criminal court of Cook county for the murder of Con-

sepcion Garcia. The jury returned a verdict finding all of the defendants guilty of murder, fixing the punishment of Davolio, who fired the fatal shot, at life imprisonment and that of the remaining defendants at fourteen years. The three plaintiffs in error (whom we will call the defendants) have sued out a writ of error. Russo escaped from the Cook county jail after he was sentenced and so far as the record discloses has never been re-captured.

The only points made and argued in the briefs for the defendants are, that the evidence was insufficient to sustain their convictions and that the court erred in instructing the jury.

The record discloses that the defendants had been acquainted with one another for some time prior to the homicide, although it appears that Davolio was the only one who knew the deceased. On June 1, 1929, at about 12:45 A. M., Davolio entered a restaurant near Halsted and Taylor streets, in Chicago. There he met Sardone, Riccio and Russo and a fourth party by the name of Bonjoni, who was not indicted. The four men left the restaurant after telling Davolio that they would meet him later back of some bill-boards on a vacant lot at 848 West Taylor street. This street runs east and west and the vacant lot is on the north side thereof. The record is silent as to the purpose of this meeting and fails to disclose that the four who were to meet Davolio had any common understanding to do any unlawful act. The night was warm, and the only reason shown by the evidence for their statement to Davolio was that they were not going home but expected to sleep in an old, abandoned Ford car located on the vacant lot, behind a bill-board. Davolio soon left the restaurant and walked west on the north side of Taylor street until he came to the vacant lot. As Davolio was standing on the walk in front of the lot Garcia approached. Davolio shot Garcia, then left the scene hurriedly, being accompanied a short distance to an alley by his four friends,

all of whom had witnessed the shooting. Upon reaching the alley Davolio ran east while the other four ran west. After their flight the group met again farther east on Taylor street. Garcia walked away from the scene of the shooting and some doubt was expressed by Davolio's companions that he had been shot. Davolio reassured them on this matter by stating that he was so close to Garcia that the shot could not have missed its target. At about 1:00 o'clock that morning Consepcione Salinas, a Mexican woman living at 1012 Newberry street, heard a knocking at the door of her home. Upon arising she found Garcia, whom she had known for years, slumped down at the base of the door. He besought her to take his money and watch and give them to his mother, as he was dying. The police were called at once and secured a dying declaration in writing signed by Garcia. The substance of this written declaration and the oral statements made by Garcia at the time, the legal sufficiency of which is not questioned by the defendants, is as follows: That Garcia was walking west on the north side of Taylor street; that when he came opposite to 848 West Taylor street three men were standing on the sidewalk, one of whom told him to "stick up" his hands; that Garcia refused to put up his hands and reached in his pocket for a screw-driver; that thereupon one of the men shot him, and that they then ran away, failing to take his money from him. He described the men as Italians, saying that he would be able to recognize them and describing the attire of the man who shot him with some particularity.

Davolio admits that he shot Garcia but gave different reasons for the act upon three different occasions. In his signed statement made to the police, the legal sufficiency of which is also not questioned, Davolio related that about three weeks before the shooting the deceased made some remarks about his girl's legs. To these remarks Davolio took exception but said that Garcia drew a knife and told him to mind his own business. In this statement Davolio

admitted that he had met Garcio nearly every day since that episode but had never been troubled by him. At the coroner's inquest Davolio told a different story. He there said that he and Garcia happened to be attending the same dance and both danced with the same girl, who was a stranger to Davolio; that Garcia warned him to quit dancing with her; that this warning put him in fear of his safety; that on the day of the shooting he saw Garcia on Taylor street; that he then went to his home, a short distance away, and procured his revolver, returned to Taylor street and waited for Garcia to approach. After Garcia had passed him about five steps Davolio said that he overtook him, grasped his shoulder and turned him around so that the two were facing each other; that Garcia thereupon pulled out of his pockets two objects which Davolio took to be weapons, judging one to be an ice-pick. Believing that Garcia was making an effort to attack him Davolio shot him. At his trial Davolio again recounted how Garcia had commented on the appearance of his girl's legs. He there testified that on the night of the shooting he had started to walk west on the north side of Taylor street when he noticed two men on the south side thereof. He said that as these men crossed over to the north side of the street he immediately crossed over to the south side and continued on for about half a block. He remembered that the other defendants and Bonjoni were waiting for him in the vacant lot at 848 West Taylor street, so again he crossed over to the north side of the street, as he was afraid and wanted to have the protection of his friends. As he reached the walk on the north side he said he was accosted by Garcia and at the same time saw a man approaching the two from the south side of the street. He related that Garcia asked him if he was the fellow who had his girl at the dance the other night and then reached in his pocket. The man was still approaching from across the street when Davolio reached for his gun. Garcia then raised his hands in the air,

brandishing what Davolio took to be an ice-pick and a knife. He said Garcia made a "pass" at him and then made a second pass, following which Davolio fired. Davolio said he then ran north through the vacant lot where his friends were. He denied any attempt at a hold-up of Garcia and also denied that the other defendants had anything whatever to do with the killing.

Joe Russo made a written statement to the police of his version of the killing and its attendant circumstances. This statement was read by Sardone and Riccio. Each of them in his written statement to the police said that the statement made by Russo was true with the exception of certain minor details. Neither Russo, Sardone or Riccio testified at the trial, nor did either of them question the legal sufficiency of the statements which were introduced in evidence by the prosecution. The statement of Russo tells of the meeting in the restaurant and the arrival of Davolio at the vacant lot. It narrates how Davolio met Garcia on the walk in front of the lot, and that the four who witnessed the meeting thought that the two men on the walk were in a fight. Russo tells of Riccio and Bonjoni going to the two men and that just as they reached them Davolio shot Garcia. The four men, accompanied by Davolio, then ran north through the vacant lot to an alley, the four going west in the alley while Davolio ran east therein. The westbound four then cut south through a yard and came out on Taylor street a short distance from the scene of the shooting. They saw Garcia walking across Taylor street towards Newberry avenue. The four remained at this spot for several minutes discussing whether Garcia had been hit. They afterwards walked east on Taylor street to Peoria street, where they were joined by Davolio, who assured them that he had not missed Garcia as he had been too close. The group then disbanded, each man going his own way. Riccio agrees with Russo's statement, denying, however, that he left the old car behind the bill-board to go to Davolio

and Garcia. Sardone agrees with what Russo stated, except that he denies that he saw Davolio at Taylor and Peoria streets after the shooting. None of the companions of Davolio admit knowing Garcia or of having seen him before the night of the crime.

Sardone and Riccio contend that inasmuch as they have been indicted as principals in the alleged crime it was incumbent upon the prosecution to show that they were not only present at the scene of the killing but that they participated therein or did some act at the time of the commission of the crime in furtherance of a common design. Garcia's dying statement was that he was held up by three men. Russo stated that Riccio and Bonjoni went to the spot where Garcia and Davolio were apparently fighting. This corroborates Garcia on that score, although Riccio denies going to the scene while Sardone agrees with the Russo version. There is a total lack of evidence bearing directly upon the theory of the prosecution that all of the defendants were principals or co-conspirators. No proof of a common intent or design arrived at by the defendants to rob Garcia has been established by direct evidence, nor can the existence of such common intent or design be reasonably inferred from all the evidence. The defense theory adopted by Davolio runs counter to a robbery motive. No proof is made that the defendants met at the restaurant by common intent or that they intended to rob when all agreed to meet at the vacant lot. It is true that they all met after the shooting, but it is not established that they met then by common design. There was insufficient evidence on which to base the inference which the prosecution wanted the jury to make, and which it did make when it found Sardone and Riccio guilty of murder. The respective statements of Sardone, Russo and Riccio cannot be termed confessions of the commission of the crime of murder. However, the jury was fully warranted in returning the verdict of guilty against Davolio. The stories advanced by him

at different times in an endeavor to clear himself of the responsibility for his act are inconsistent. The reasons assigned by him did not warrant the procuring and carrying of a concealed deadly weapon on a public highway. His stories of being molested by the deceased, when taken alone and studied without reference to the other stories, do not in the least show that he shot Garcia in self-defense. He met the deceased nearly every day subsequent to the times he alleges that Garcia threatened him and he was never molested. The weight of the evidence demonstrates that Garcia was an industrious worker and not possessed of a belligerent nature. The inconsistent stories told by Davolio were sufficient to justify the jury in believing, as it evidently did, that he was looking for trouble with Garcia and not seeking to avoid it. The evidence clearly shows that he was the aggressor—that he shot Garcia down without justification—and the verdict of the jury finding him guilty of murder was fully warranted, but there was no proof beyond a reasonable doubt of a common intent to rob or commit another crime such as would warrant the conviction of Sardone and Riccio as co-conspirators or establish the existence of any conspiracy.

Thirty-two instructions were given to the jury, to which the defendants made a blanket objection without making specific or particular objection to any instruction. The abstract of the record fails to show at whose request the instructions objected to were given. Such type of objection will not save for review any question as to the propriety of instructions. Any general objection to matters, parts of which are competent, will not preserve for review that part which is incompetent. The objection must be specific. (*People* v. *Selknes,* 309 Ill. 113.) When objection is made to an instruction the error must be pointed out. (*People* v. *Priddy,* 327 Ill. 50.) Error cannot be predicated upon the giving, refusal or modification of instructions unless the instructions objected to are set forth in the abstract, and

it must be shown who offered the instructions concerning which error is assigned. *People* v. *Vickers,* 326 Ill. 290; *People* v. *Gabrys,* 329 id. 101.

For the reasons above given, the judgment of the criminal court of Cook county as to William Davolio is affirmed and the judgment of that court as to Mike Sardone and Tony Riccio is reversed.

*Affirmed in part and reversed in part.*