THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PAUL EDWARD CRAYTON, Defendant-Appellant.

Fourth District   No. 4—87—0885

Opinion filed November 3, 1988.

Daniel D. Yuhas and Lawrence J. Essig, both of State Appellate Defender's Office, of Springfield, for appellant.

Donald M. Cadagin, State's Attorney, of Springfield (Kenneth R. Boyle, Robert J. Biderman, and Denise M. Ambrose, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE SPITZ delivered the opinion of the court:

Defendant Paul Edward Crayton was charged by information in the circuit court of Sangamon County with first-degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)). The information alleged that the defendant, without lawful justification and with intent to kill, burned Nyana Johnson by setting her on fire, thereby causing her death. Following a jury trial, defendant was convicted of the charged offense and the trial court entered judgment on the verdict. Defendant was thereafter sentenced to 30 years' incarceration in the Illinois Department of Corrections and three years' mandatory supervised release, with credit for 136 days spent in custody awaiting trial and sentencing. Defendant now appeals, arguing the trial court erred in al-

lowing the State to introduce: (1) the testimony of a rebuttal witness regarding defendant's prior criminal conduct toward the decedent; (2) evidence and argument that its chief witness was credible because the witness had given authorities prior consistent statements; (3) hospital photographs and autopsy slides of the decedent; and (4) statements made by the decedent inculpating the defendant, as a dying declaration and a spontaneous declaration. For the reasons that follow, we affirm.

The record before us reveals that on July 25, 1987, 25-year-old Nyada Johnson suffered massive burns to her body during a gasoline fire which occurred at the Springfield residence of her 43-year-old boyfriend defendant Paul Edward Crayton. On July 28, 1987, the defendant was arrested pursuant to a warrant charging him with attempt (murder) based on probable cause that he had poured gasoline on Johnson while she was sleeping and then set her on fire. Johnson died 19 days later, and on August 21, 1987, defendant was charged by information in the circuit court of Sangamon County with first-degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)). The information alleged that on July 25, 1987, the defendant, without lawful justification and with intent to kill, burned Nyana Johnson by setting her on fire, thereby causing her death.

A jury trial commenced on October 27, 1987. A hearing was held at the onset of the trial on the defendant's motions *in limine* to preclude the State from introducing into evidence the decedent's statements and photos and autopsy slides of the decedent. Following an offer of proof on the decedent's statements, both motions were denied. The defendant also moved to declare prosecution witness Vernon Gragg incompetent and preclude the State from calling him as a witness. The court conducted a competency hearing during which Gragg testified on direct examination to his date of birth, age, and present address and he acknowledged that two years earlier he had been under the care of psychiatrists in Jacksonville and Springfield, Illinois, mental facilities. Gragg further testified that he was blind in his left eye and had bad vision in his right eye. Gragg stated that he could read. Finally, Gragg stated that he did not know what an "oath" was but he understood that when in court he was to tell the truth. The court denied defendant's motion, finding Gragg's alleged defective memory, limited opportunity or capacity of perception, and impaired ability to convey and communicate what he had seen did not necessarily disqualify him as a witness but, instead, were matters of credibility for the jury to decide.

Opening statements were then given. During the State's opening

statement the prosecutor referred to several statements Gragg gave to the police shortly after the incident.

The State's first witness was Dennis Aherin. Aherin testified that he lived next door to the defendant and had known him two to three years. According to Aherin, he was at home on the evening of July 25, 1987, and the defendant came to his door and asked him to call the fire department because defendant's house was on fire. Aherin entered his house and placed a call to 911. Aherin then went back outside and the defendant informed Aherin that his "$4,000 stereo" was inside the house and was "burning up." Aherin indicated that he saw Johnson lying on the grass beside his house and asked the defendant if she was burned. The defendant stated: "Yeah." That was the first time the defendant had mentioned to Aherin that Johnson had been injured. Aherin then overheard the defendant inform a fireman that "the woman had poured gasoline in his house and was trying to burn it down." The defendant also told the fireman that he was standing outside of his house working on his car at the time the fire started. In speaking with the defendant, Aherin noticed that the defendant was unusually calm and that his hair and mustache were singed.

The State's next witness was Springfield police officer Richard Wayne Daley. Daley testified that on July 25, 1987, at approximately 6:40 p.m. he was dispatched to the defendant's residence. After he arrived, Daley spoke with the defendant and was told that the defendant "and Nyana Johnson had been arguing all day." The defendant further indicated to Daley that Johnson had been living with him for approximately one year and the two were arguing "over him having another, girl friend, and [Johnson] had come outside and said if she couldn't have him, nobody would have him, and she picked up [defendant's] gas can and went back inside [defendant's] house. The defendant told Daley that he was outside his house, working on his car at that time. Daley estimated that the defendant was located approximately 10 feet from the front door of his house. The defendant further told Daley that he thought Johnson was "bluffing" but then heard her pouring gas inside the house and lighting a lighter. The defendant did not tell Daley that anyone had been injured in the fire. Daley noticed that the defendant's facial hair and the hair on his head seemed to be "either graying or singed." Further, the defendant appeared "very calm."

The next witness to testify for the State was Steve Melton, a battalion chief with the Springfield fire department. Melton testified that on July 25, 1987, his fire brigade was summoned to the defendant's residence. When he arrived he spoke with the defendant and noticed

he was "very calm, just as if nothing was going on." In Melton's opinion "he was too calm." The defendant informed Melton that there had been a fire in the back hallway but did not inform him that anyone had been injured. Melton subsequently observed Johnson "being led around the back of the house into the driveway area." Melton testified that "some young fellow, black fellow was with her, had her by the arm," and she was naked and burned. Melton then asked the defendant what was going on, explaining:

"Because he hadn't mentioned the fact that there was anybody in the house burned, injured. He just indicated that he had a fire, and to me, I wanted to know why he didn't tell me that. You know, we could have done something quicker."

The defendant then stated to Melton that he and Johnson were fighting and she "took gas and poured it all over the hall and herself and lit her lighter." The defendant further stated to him that at the time the fire started, he was outside working on his car and he could see Johnson through the window of the front door. The defendant also told Melton that Johnson had been running through the house naked, taunting him, and was naked when she set herself on fire. Melton testified that he inspected the residence and found that the major fire damage was located in the rear hallway, extending partially into the kitchen. He further found a red cigarette lighter located approximately six inches inside the bedroom door off the hallway. He also found a two-gallon red gas can lying along the kitchen wall and adjoining the hallway. Additionally, Melton stood where the defendant claimed to have been when the fire started but was not able to see down the hallway from the front door.

Over defense counsel's objection, the State called Kim Conn, a registered nurse at Memorial Medical Center's Regional Burn Center in Springfield. Conn testified that she was called into work early on the evening of July 25, 1987. When she arrived at work at approximately 8:30 p.m., Johnson was receiving treatment in the Burn Center's "temp room." Conn stated that residents were doing an initial assessment, "going through the IV's *** and tubbing her." Conn indicated that it was routine procedure for the medical personnel to take photographs of the burns as part of the assessment "when the burn victim was burned as badly as [Johnson]." Seventeen color photographs depicting an overall view of Johnson's burns and closer views of particular areas of her body were used in explanation of Conn's testimony and were admitted into evidence. Conn testified that Johnson sustained burns "essentially everywhere" except her feet, perineum, buttocks, and some of her face. The third-degree burns to

Johnson's body were evident on her abdomen, back, chest, right upper thigh, left flank, left upper arm, and the back of her left hand. She sustained second-degree burns to her left forearm, left leg, back of her right leg, and a portion of her right palm.

Conn next testified that she began to participate in the treatment of Johnson at approximately 8:30 p.m. and spent the whole evening attending Johnson. When Conn first saw Johnson, she was combative, verbally abusive, and resisted treatment. The medical personnel believed she had been drinking and thus did not treat her with sedatives or anesthetics. Johnson was ultimately taken to her room at midnight. By 2 a.m. Johnson was still "very wild, combative," and had to be restrained. Conn testified that she was still attending Johnson at 2 a.m. and that Johnson:

> "[H]ad been going on and on talking and a lot of other things. I was charting it in the room, and I hadn't paid, you know, a lot of attention to real details, but she kept repeating that she was going to get him, and she finally sat up in bed and was gripping the side rail, and she just kept saying, 'I'm going to get him, I'm going to get him,' and she was getting more upset, and I went to her right at the bed and asked her, 'Who,' and she said, 'Paul,' and I asked her, 'Why,' and she said, 'Because he did this to me,' and I did not pursue this matter any more. She was getting very wild, and I felt that it was my responsibility to try to calm her down for her own safety."

Conn further testified that not long after Johnson made this statement she was intubated and was never again able to communicate verbally.

The State's next witness was Natwar Mody, a pathologist at Memorial Medical Center. Mody testified that on August 13, 1987, he performed an autopsy on Johnson. Slides made of Johnson's body prior to the autopsy process were used in connection with Mody's testimony and were admitted into evidence. Mody explained each slide, discussing the extent of the burns and what body parts had been burned. Mody noted that the difference between the degree of burn on Johnson's back and that on her buttocks, including a line of demarcation, indicated that she may have been protected by some clothing. Mody explained that roughly 60% to 65% of Johnson's body sustained deep thermal injury. In addition to her external injuries, Johnson suffered "very diffuse and very profound" inhalation injury to the lungs. Mody testified that this lung injury, referred to as Adult Respiratory Distress Syndrome, ultimately caused Johnson's death on August 11, 1987. He explained that other contributory causes of her death were

"the extensive burns, the septis of the burns that followed, the septicemia and the lung infection that followed."

Springfield police detective David L. Duke and Springfield fire department investigator Paul Howard Nevitt testified on behalf of the State. Duke and Nevitt testified that they were assigned to participate in the investigation of the fire at the defendant's residence. The investigators testified that on July 27, 1987, they took a written statement from Vernon Gragg, who had witnessed the events surrounding the fire.

The investigators further testified that they spoke with the defendant regarding the incident. According to Duke, the defendant told them that Johnson had arrived at his house on the day of the fire with a bottle of whiskey and was wearing blue jeans and a striped top. Vernon Gragg had arrived sometime earlier. Johnson was upset and was arguing with the defendant about another woman. They continued to argue "off and on all day." The defendant informed them that Johnson was in the house with Gragg and he was outside working on his vehicle in the driveway until approximately seven minutes before the fire started. The defendant told the investigators that while outside working on his car he saw Johnson go from the living room of the house into the kitchen area and pick up a can of gasoline that was behind a door. The defendant next told them that Johnson had changed into a dress. Five minutes before the fire, however, Johnson pulled off the dress and threw it down on the floor. The defendant informed the investigators that Johnson then walked to the "bedroom hallway area" and started pouring gasoline on the hallway floor. She allegedly had an unlit cigarette in her hand at the time. He further informed the investigators that he then heard a "whoosh" and suddenly Johnson was on fire. He told them that Johnson was completely naked at the time. He told the investigators that he helped Gragg put out the fire. The defendant noted that prior to the fire Gragg had been in the kitchen and did not see what happened. The defendant denied tying Johnson's feet together that day but told the investigators that he had "tied her up in the past." Further, the defendant denied striking Johnson with a baseball bat that day but informed them that "he had hit her or attempted to hit her in the past."

Duke testified that they searched the defendant's residence and recovered a rope, two baseball bats, a pair of blue jeans, and a striped shirt. Nevitt testified that they were unable to find a burn pattern and there was no indication that gasoline had been poured on the floor. Nevitt further stated that samples taken revealed that gasoline

had been poured on the couch.

The State's next witness was Eric Young, a forensic scientist with the State Police Forensic Laboratory. Young testified that he analyzed the blue jeans and striped shirt that were found at the defendant's residence. He explained that no flammable or combustible liquids were found to be present on the blue jeans and his findings were inconclusive as to the shirt due to the material of which it was made. Young indicated that the jeans were most badly burned at the waist, the top of the pockets and near the bottom of the legs. He stated that the right side of the shirt and the left sleeve were the areas most badly burned on the striped shirt. Young also testified that the samples taken from the couch revealed the presence of gasoline.

The State called Michael Aherin, the defendant's neighbor. Aherin testified that from his window he saw the defendant working on his car in the driveway at 10 a.m. on the morning of the fire. Aherin stated that he did not see the defendant outside during the period from 10 a.m. to 3 p.m., when Aherin left his home. Aherin further testified that he saw Johnson on the day of the fire and she was wearing pants and a shirt. He had known Johnson for eight months and had never seen her wear a dress.

Next to testify was Lori Wiese, a Springfield patrolman. Wiese testified that on July 26, 1987, Vernon Gragg spoke with her at the police station for approximately five minutes. She further testified that Gragg returned to the police station later that evening and she took a written statement from him.

The State's last witness in its case in chief was Vernon Gragg. Gragg testified that he knew the defendant and indicated that he had spent time at the defendant's house. Gragg further testified that he had known Johnson for approximately one year and stated "I'd say I fall [sic] in love with her." According to Gragg, he arrived at the defendant's house at approximately 9 a.m. on the day of the fire. Johnson arrived at 1 p.m. and she, Gragg, and the defendant began drinking whiskey. Later that day Gragg and the defendant bought some gasoline and the defendant put one gas can in the bedroom of the house.

Gragg identified People's exhibit No. 32 as a baseball bat belonging to the defendant. Gragg stated that on the day of the fire, the defendant and Johnson had been fighting "about a whole lot of things" and the defendant hit Johnson on the forehead and feet with the bat.

Gragg next testified that at some point that day Johnson fell asleep on the couch beside him. According to Gragg, the defendant

asked him to get the gas can. Gragg then brought the gas can into the living room and the defendant said "he was going to do that, he was going to wait until the bitch goes to sleep. *** He was going to pour gas on her. *** Take the cigarette lighter out. *** And light her up." The defendant then poured some gas into a cup, set the gas can on the floor and poured the gas from the cup on Johnson's chest and stomach. At this point, Gragg went to the bathroom, and when he returned to the living room he saw that Johnson was still asleep on the couch and that the defendant had "tied her feet up" with a rope. Thereafter, the defendant "got the cigarette lighter out *** [of] his pocket *** [and] he pulled her by her feet to see if she had some feeling in her feet and lit the lighter." Gragg told the defendant, "Don't do it." Gragg then untied Johnson's feet. At this point Johnson awoke, lay down on the floor whereupon the defendant poured gas on her back.

Gragg testified that Johnson then indicated that she wanted to go to the bathroom. Gragg stated that the defendant would not allow her to do so and said to her, "Go outside and go to the bathroom." Eventually, Gragg took Johnson to the bathroom and was followed by the defendant. The defendant then lit some newspapers but Gragg put out the fire. According to Gragg, Johnson went back to the living room and lay down. Johnson began to itch so Gragg got a towel with soap and tried to wash her face. Afterward, Johnson went to the bedroom and the defendant followed her, carrying the gas can in his hand. Thereafter, Johnson and the defendant came out of the bedroom and Johnson was on fire. The defendant told Gragg that he was going to call the fire department and Gragg "pulled [Johnson] outside *** pulled her clothes off *** [and] told her to sit down on the ground until the firemen [got there]." Johnson had been wearing blue jeans and a shirt.

Gragg testified that after the firemen arrived the defendant told him "not to say nothing about it." Gragg gave a statement to Detective Duke and another investigator the following day. Gragg further testified that he never saw Johnson with the gas can or cigarette lighter on the day of the fire. He stated that the defendant kept the lighter in his pocket that day.

On cross-examination, Gragg testified that he loved Johnson and that the two had talked about marriage. He stated that he and the defendant had been drinking whiskey before Johnson arrived on the day of the fire. He also stated that he brought a baseball bat with him that day. Gragg testified that after Johnson and the defendant had a fight that day Gragg "told her to knock it out *** [and] hit her on the

face." Gragg also testified that he was blind in his left eye and had only partial sight in his right eye. Gragg indicated that he spent time in the Jacksonville and Lincoln State hospitals. On redirect Gragg testified that he did not graduate from high school and while attending school he was a special education student. This concluded the State's case in chief. Defendant's motion for judgment of acquittal was denied.

The defense then called Kenneth Everett Barton, Sr. Barton testified that he had known the defendant for approximately 10 years, believed he had an excellent reputation and was a peaceful, law-abiding citizen.

The next witness for the defense was Virgil J. Rhodes, Jr. Rhodes testified that he had known the defendant for over 30 years and that the defendant was a peaceful, law-abiding citizen with a good reputation in the community.

The defense recalled Springfield patrolman Lori Wiese. Wiese was questioned about the statement she took from Gragg on July 26, 1987. Wiese acknowledged that Gragg's statement did not say that the defendant hit Johnson in the head with a baseball bat, held a lighter to Johnson's feet or tied her feet together. Wiese testified on cross-examination that when she took Gragg's statement he was nervous and difficult to understand. The prosecution then instructed Wiese to read Gragg's statement to the jury. Defense counsel objected to the reading of the statement and the trial court sustained the objection. The prosecutor then offered Gragg's statement into evidence. Defense counsel objected and moved for a mistrial. The court denied the motion for a mistrial but refused to allow the statement into evidence, noting "there is no possible theory of law that allows for the admission of this document as a prior consistent statement."

The defense recalled Springfield police detective David L. Duke. Duke was questioned about the statement he took from Gragg on July 27, 1987. Duke indicated that the statement did not say that the defendant hit Johnson in the head with a bat. On cross-examination, Duke stated Gragg informed him that the defendant had swung the bat at Johnson but missed her.

The defendant then testified on his own behalf. The defendant testified that he began living with Johnson at his current residence in May of 1986. He met Vernon Gragg through Johnson, three months prior to the fire. According to the defendant, Johnson left their residence at 8 p.m. on July 24, 1987, and did not return until the next morning. On the morning of July 25, 1987, the day of the fire, the defendant began working on his car at 7 a.m. Vernon Gragg arrived

at approximately 8 a.m. and Johnson arrived at 9 a.m. Johnson brought a bottle of whiskey with her and was wearing a blouse and blue jeans.

The defendant testified that Johnson attempted to argue with him about a woman named Pat but that he would not participate. To avoid the argument, he went back outside to work on his car and took Gragg with him. Thereafter, Gragg and the defendant went to a nearby gas station and purchased one gas can and five antifreeze containers worth of gasoline for his car. After returning home, they removed the containers of gasoline from his car and put them on the porch of the house. At this point Gragg went into the house and remained there. The defendant poured four to five gallons of gasoline that they had purchased into his car and started working on the car again. The defendant went inside the house several times that afternoon to retrieve tools, cool off, or smoke a cigarette. The defendant stated that Johnson attempted to argue with him when he went in the house.

According to the defendant, later that afternoon he overheard Johnson and Gragg arguing in the living room. The defendant "yelled in there for them to quit arguing in there" but the arguing "continued for some time during the afternoon." Johnson then came out onto the porch and was wearing an orange terry cloth dress with no shoes. Johnson began yelling at the defendant and then returned inside the house, carrying a gas can. The defendant testified further that after Johnson went in the house he heard what sounded like furniture being moved. Shortly thereafter he entered the house and noticed that furniture had been moved and other things had been scattered. The defendant sat down on a mattress in the living room and Johnson came from the hallway wearing no clothes.

The defendant stated that Johnson started arguing again and was holding a cigarette and his cigarette lighter. According to the defendant, Johnson went through the kitchen area to the bathroom and turned on the water. She then came back from the kitchen, picked up a gasoline can that was sitting by the kitchen door and walked to the hallway. The defendant then testified:

> "I could see her shaking it like this here (indicating) so I hollered, and I said, 'why don't you put that can down and go in there and go to sleep,' because she had never been to the point where, you know, I figured she would do something, you know, as bad as this turned out to be, so I heard the can—[It] touched down on the floor, and I assume she had set it down. I looked up, and she came out of the bedroom with this terry cloth dress

> on just a few minutes or so before that, and she came in \*\*\* threw the dress at me and \*\*\* apparently, she went back into the bedroom area \*\*\* and bathroom area \*\*\*. Then, as I sat there, things got a little quieter, and. I heard the cigarette lighter flick, I think, a couple of times, and from that point on, I looked, and there was flames of fire that came up to the glass door."

The defendant stated that he saw Johnson coming through the door and she was on fire. He jumped up and ran through the kitchen. Gragg was in the kitchen, looking into the refrigerator at the time. The defendant stated that he picked up some clothing that was on the floor and tried to "put her out." He called to Gragg, who ran over from the refrigerator and put a coat around Johnson's lower body. The defendant and Gragg took Johnson out of the house. The defendant then went to a neighbor's house and asked him to call the fire department "and tell them we had a fire in the house and [Johnson] had been injured." The defendant testified that on July 25, 1987, he did not strike Johnson in the forehead with a bat, tie her feet together, apply a lighted lighter to her feet, pour gasoline on Johnson, or cause her to be on fire.

On cross-examination, the defendant stated he did not visit Johnson in the hospital after the fire. He further stated that his relationship with Johnson had not always been pleasant. He denied that he argued with her, that those arguments led to violence and that he hit her. He also denied drinking any whiskey on the day of the fire and stated that he drank only one beer that day. The defendant maintained that he was cool, calm, and collected all that day and refused to argue with Johnson.

According to defendant, Aherin was mistaken when he testified that defendant failed to mention that Johnson was injured in the fire and did not tell the truth when he stated that defendant expressed concern about his stereo. Defendant denied telling either Melton or Daley that he was outside working on his car when the fire started and stated that it was not possible to see inside the house from the driveway if the front door is closed. Defendant further denied telling Duke and Nevitt that he was outside working on his car when he saw Johnson pick up the can of gasoline from the kitchen and pour gasoline down the hallway to the entrance of the bedroom. Defendant testified that the only place he actually saw Johnson pour gasoline was by the doorway which separated the hallway and living room. Defendant also testified that the blue jeans and white-striped blouse that Duke and Nevitt collected when executing the search warrant were

not the same jeans and blouse that Johnson wore most of the day of the fire before she put on the terry cloth dress. He admitted that he had bound Johnson's feet with rope in the past.

After the defense rested, the State called Iris Porter as a rebuttal witness. Defense counsel's objections to Porter's testimony were overruled. The court allowed the testimony as impeachment because the defendant had testified that he never struck Johnson. Porter, Johnson's older sister, testified that in early July 1987, she saw the defendant kick and hit her sister, knocking her down. This concluded the presentation of evidence.

Several times during closing argument, the prosecution referred to the two statements Gragg gave to the police. Then, following deliberations, the jury found the defendant guilty of first-degree murder and the trial court entered judgment on the verdict. Defendant filed a motion for a new trial on December 1, 1987. The motion was heard and denied on December 11, 1987, and the defendant was thereafter sentenced to a term of 30 years' incarceration in the Illinois Department of Corrections and three years' mandatory supervised release, with credit for 136 days spent in custody awaiting trial and sentencing. This appeal followed.

Defendant's first contention pertains to the testimony of a prosecution rebuttal witness regarding defendant's prior criminal conduct toward the decedent. As discussed above, the trial court allowed the State to call Johnson's sister, Iris Porter, as a rebuttal witness to testify that approximately two weeks prior to the fire she observed the defendant kicking and striking Johnson. The court allowed this testimony as impeachment evidence because the defendant had testified on cross-examination that he had never struck Johnson or used physical violence against her. The defendant now contends on various grounds that the admission of this unrelated other crimes evidence was reversible error. The defendant first asserts that the State improperly "bootstrapped" the introduction of rebuttal evidence of unrelated criminal conduct by cross-examining the defendant very generally about any such conduct and then used his response as a basis for the introduction of the rebuttal evidence. He further asserts that the rebuttal evidence was irrelevant and inadmissible as it only showed his propensity to commit crime. Finally, the defendant argues that the evidence was erroneously introduced to rebut the defendant's evidence of his good reputation in the community. The State contends that the rebuttal evidence was properly allowed to impeach the defendant's testimony.

■ Generally, evidence of other crimes or wrongful conduct is in-

admissible if relevant merely to establish the defendant's propensity to commit crime or wrongful acts. (*People v. King* (1986), 109 Ill. 2d 514, 488 N.E.2d 949, *cert. denied* (1986), 479 U.S. 872, 93 L. Ed. 2d 173, 107 S. Ct. 249; *People v. Bartall* (1983), 98 Ill. 2d 294, 456 N.E.2d 59.) Where evidence has no value beyond the inference that the defendant has a propensity for the crime charged, the evidence should be excluded. (*People v. Stewart* (1984), 105 Ill. 2d 22, 473 N.E.2d 840, *cert. denied* (1985), 471 U.S. 1131, 86 L. Ed. 2d 283, 105 S. Ct. 2666; *People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6.) The underlying rationale is that such evidence is objectionable not because it has no appreciable probative value, but because it has too much. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238; *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 485 N.E.2d 1292.) The supreme court has stated that the law distrusts the inference that because a man has committed other crimes or wrongful acts, he is more likely to have committed the crime charged. *People v. Lehman* (1955), 5 Ill. 2d 337, 342, 125 N.E.2d 506, 509; *People v. Romero* (1977), 66 Ill. 2d 325, 330, 362 N.E.2d 288, 290.

However, evidence of other crimes is admissible if it is relevant for any purpose other than to show the defendant's propensity to commit crime. (*People v. Stewart* (1984), 105 Ill. 2d 22, 62, 473 N.E.2d 840, 860; *People v. Baptist* (1979), 76 Ill. 2d 19, 27, 389 N.E.2d 1200, 1204.) It is well settled that other crimes evidence is admissible if relevant to prove *modus operandi*, intent, identity, motive, absence of mistake or accident, or common scheme or plan. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821, *cert. denied* (1983), 464 U.S. 844, 78 L. Ed. 2d 136, 104 S. Ct. 145.) Further, the court in *Kimbrough* discussed a variety of other instances in which evidence of the commission of other crimes or wrongful conduct has been found to be admissible. Such instances are where the evidence is relevant to prove: absence of an innocent frame of mind or the presence of criminal intent; knowledge, circumstances or context of the defendant's arrest; placement of the defendant in proximity to the time and place of the crime; identification of the weapon used in the crime; consciousness of guilt; circumstances of the crime charged that would otherwise be unclear, whether the crime charged was actually committed; opportunity or preparation; and an otherwise implausible fact relating to the crime charged. See *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 485-86, 485 N.E.2d 1292, 1296 (and cases cited therein).

Of significance in the instant case, evidence of other crimes is also admissible to demonstrate the defendant's dislike for, or attitude toward, the victim. (*People v. Kissinger* (1983), 116 Ill. App. 3d 826,

831, 452 N.E.2d 615, 618-19; *Kimbrough*, 138 Ill. App. 3d 481, 485 N.E.2d 1292; *People v. Smythe* (1971), 132 Ill. App. 2d 685, 270 N.E.2d 431.) In *Smythe*, the defendant was charged with the murder of his wife. At trial, the deceased's mother was allowed to testify that 11 months prior to her daughter's death, the defendant telephoned her and told her how he had knocked down a man walking with his wife and that he tried to cut his wife's throat and left her for dead. The mother also testified that her daughter walked into her apartment during this conversation and the daughter's neck was bleeding. The *Smythe* court held that this testimony was relevant to the defendant's attitude toward his wife. Moreover, evidence of other crimes is admissible on rebuttal to contradict the defendant's denials. (*Kissinger*, 116 Ill. App. 3d 826, 452 N.E.2d 615.) Rebutting evidence is that which is adduced by the prosecution to explain, repel, contradict, or disprove evidence given by the defendant. A rebuttal witness may be called to contradict the defendant's testimony as to a material issue. *People v. Gardner* (1977), 47 Ill. App. 3d 529, 362 N.E.2d 14.

The rebuttal evidence in the case at bar was admissible under either of the two theories just discussed. Porter's testimony that she observed the defendant strike and kick Johnson was relevant to demonstrate the defendant's attitude toward Johnson. Furthermore, this testimony was admissible on rebuttal to contradict the defendant's testimony that he never struck Johnson or used physical violence against her. Although the State's method of introducing the rebuttal testimony may have been somewhat questionable, it did not amount to reversible error.

Defendant's second contention is that the trial court erred in allowing the State to introduce evidence and argue to the jury that its chief witness, Vernon Gragg, was credible because Gragg had given prior consistent statements to authorities. The defendant further argues that since Illinois law prohibits the use of prior consistent statements to enhance the credibility of a trial witness, the cause must be reversed and remanded for a new trial. Defendant refers to: comments made by the prosecutor during the State's opening statement, testimony elicited from prosecution witnesses Lori Wiese, David Duke, Paul Nevitt, and Vernon Gragg and comments made by the prosecutor in closing argument. The defendant points out that during trial the defense objected to the witnesses' references to the prior consistent statements but did not object to the prosecutor's comments in opening statement and closing argument. The defendant maintains, however, that the plain error rule should apply as the case rested upon the credibility of the witnesses, particularly the witness that

made the prior consistent statements.

The State asserts that the defense only objected to the references to Gragg's prior consistent statements during the prosecution's cross-examination of Wiese and Duke. Further, the State asserts that the defendant's post-trial motion narrowed the issue to the cross-examination of Wiese and the prosecutor's attempt to publish one of Gragg's prior consistent statements. The State argues that the defendant has therefore waived all issues concerning the prior consistent statements except the issue as to Wiese's testimony. In addition the State argues that this is not an appropriate case for the application of the plain error doctrine since Gragg's prior consistent statements to the police were never published in their entirety and had no prejudicial effect.

The State next argues that notwithstanding waiver, the references to Gragg's prior consistent statements were proper "for purposes of explaining the reasons which impelled the investigators' approach toward defendant and the manner of their investigation and search of defendant's residence \*\*\*, and to meet the force of impeachment from defense counsel's inevitable suggestion that Gragg's testimony was a recent fabrication and that his memory was faulty." The State concedes that any motive of Gragg's for fabricating existed at the time the prior consistent statements were made. Further, the State acknowledges that "Illinois has not enacted a counter part of [Federal Rule of Evidence 801(d)(1)(b) (Fed. R. Evid. 801(d)(1)(b)) which] allows the fact finder to consider a prior consistent statement only as it relates to the witness's credibility." However, the State suggests that this court should reexamine its holdings in this area and "should opt for a more flexible approach," allowing a broader range of admissibility.

The State is correct in its assertion that the defense only objected at trial to the references to Gragg's prior consistent statements during Wiese and Duke's testimony. Moreover, defendant's post-trial motion only raised this issue as it concerned Wiese's testimony. Accordingly, any error in the introduction of the prior consistent statements during Gragg's and Nevitt's testimony and any error in the prosecutor's remarks during opening statement and closing argument have been waived. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) The supreme court in *Enoch* has recently emphasized that both a trial objection and a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial. Furthermore, we have reviewed the merits of the defendant's contentions and conclude that no plain error resulted.

■ The general rule as noted by the supreme court in *People v.*

*Emerson* (1983), 97 Ill. 2d 487, 501, 455 N.E.2d 41, 44, is that "evidence of statements made prior to trial for the purpose of corroborating testimony at trial is inadmissible." Exceptions to this rule allow the admission of prior consistent statements to rebut a charge or inference that (1) the witness is motivated to testify falsely or (2) that the in-court testimony is a recent fabrication. (See *People v. Shum* (1987), 117 Ill. 2d 317, 512 N.E.2d 1183 (and cases cited therein), *cert. denied* (1988), 484 U.S. 1079, 98 L. Ed. 2d 1022, 108 S. Ct. 1060.) A prior consistent statement offered to rebut a charge of motive to testify falsely or recent fabrication is admissible only if it is shown that that witness made the statement before the alleged motive to testify falsely or fabricate existed. (*People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363; *People v. Ashford* (1988), 121 Ill. 2d 55, 520 N.E.2d 332.) The State acknowledges that any motive Gragg might have had for testifying falsely existed before the time his prior consistent statements were made. Furthermore, at the time the prior consistent statements were introduced or referred to, no inference of recent fabrication or of a motive to testify falsely had been raised. (See *People v. Tidwell* (1980), 88 Ill. App. 3d 808, 410 N.E.2d 1163.) Consequently, the prior consistent statement exception does not apply here. *People v. Powell* (1973), 53 Ill. 2d 465, 292 N.E.2d 409; *People v. Andino* (1981), 99 Ill. App. 3d 952, 425 N.E.2d 1333.

■ Despite the State's suggestions that this court should modify the requirements and expand the exceptions for the admission of prior consistent statements, it is well settled that where the supreme court has declared the law on any point, it alone can overrule and modify its previous opinion. *People v. Brown* (1988), 171 Ill. App. 3d 500, 525 N.E.2d 1228.

■ Hence, the State improperly referred to Gragg's prior consistent statements. However, the error here was harmless as the evidence was not close factually and the defendant failed to demonstrate any plain error sufficient to overcome the waiver doctrine. (See *People v. Burns* (1986), 144 Ill. App. 3d 345, 494 N.E.2d 872; *People v. Woith* (1984), 126 Ill. App. 3d 817, 467 N.E.2d 614.) The entire contents of the statements were never read to the jury or introduced into evidence. Rather, the three of the four witnesses in question, including Gragg himself, merely referred to the fact that prior written statements had been made. The remaining witness, Duke, only testified to a limited portion of one of Gragg's prior statements. The foregoing references did not amount to plain error.

The defendant next contends that the trial court erred in allowing the display before the jury of hospital photographs and autopsy slides.

The record discloses that Nurse Conn testified to the severity and location of the burns to Johnson's body at the time Johnson was admitted to the hospital on the night of the fire. Seventeen color photographs of Johnson's body, taken at the time of her admission, were used by Conn in the explanation of her testimony. These photographs were admitted into evidence and were taken to the jury room. Dr. Mody testified to, *inter alia*, the infections and progressive deterioration of Johnson's condition which contributed to her death. Nine color slides of Johnson's body, taken after her death but before the autopsy, were used by Mody during his testimony. The slides were admitted into evidence but did not go to the jury as there was no slide projector. The trial court found that these photographs and slides should be admitted into evidence as they showed different aspects of Johnson's body at different points in time and were probative of the issue of how Johnson sustained the burns.

The defendant now contends that the admission of the photographs and slides constituted reversible error as they were gruesome, highly inflammatory, and had little or no probative value. Defendant further contends that the slides were unnecessary and cumulative because the medical testimony presented at trial was detailed, complete, and fully described the nature and extent of Johnson's burns. The State contends that the photographs were essential to the prosecution's theory that the defendant started the fire that resulted in Johnson's death. Further, the State asserts that the slides were taken before the internal autopsy procedures and illustrated the true depth of Johnson's burns and the amount of viable tissue that was destroyed by the fire. The State asserts that the slides corroborated Mody's testimony as to the percentage of Johnson's body surface injured in the fire, the cause of the burns resulting from direct contact with the flame, and the sepsis which contributed to Johnson's death.

■■ ■ The principles governing this issue are well known. Photographs depicting the condition of the decedent are normally admissible as probative of one or more issues in a homicide prosecution such as manner or cause of death, means used, and location of the events in question. (*People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6; *People v. Kubat* (1983), 94 Ill. 2d 437, 447 N.E.2d 247, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 174, 104 S. Ct. 199.) The fact that the photographs are gruesome is no bar to admissibility. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238; *People v. Minnis* (1983), 118 Ill. App. 3d 345, 455 N.E.2d 209.) Likewise, it is no bar that they are cumulative to oral testimony covering the same issue, as photographs may be properly admitted to corroborate testimony on

the same subject. *People v. Henenberg* (1973), 55 Ill. 2d 5, 302 N.E.2d 27.

The admission of photographs is within the sound discretion of the trial court. (*People v. Lefler* (1967), 38 Ill. 2d 216, 230 N.E.2d 827.) That discretion was not abused in the instant case. The photographs and slides were clearly relevant to prove facts in issue. The photographs here illustrated the condition of Johnson's body after the fire, including the areas that were burned, the varying degrees of burns to those areas, the absence of burns in certain areas, and the lines of demarcation. The photographs corroborated Nurse Conn's testimony on this matter and were probative of the manner and cause of the fire. The slides were properly admitted to corroborate and explain the pathologist's testimony concerning the depth of the tissue damage, infections, and progressive deterioration that contributed to Johnson's demise. Moreover, the photographs and slides discredited the defendant's testimony regarding who actually started the fire, how and where the fire started, and whether Johnson was naked or clothed at the time she caught fire. Accordingly, we hold that the admission of the photographs and slides was not an abuse of discretion.

In so holding we note that the cases relied upon by the defendant are readily distinguishable from the case at bar. First, in *People v. Garlick* (1977), 46 Ill. App. 3d 216, 360 N.E.2d 1121, *cert. denied* (1977), 434 U.S. 988, 54 L. Ed. 2d 484, 98 S. Ct. 620, the court found that in view of the defendant's admission of the offense and his defense of insanity, the photograph of the deceased's massive head wound was not probative of any material issue in the case. The court concluded that since there was no issue as to the cause of death or identity of the victim and because the medical testimony regarding the nature and extent of the head wound was wholly understandable, the use of the photograph was needlessly prejudicial.

Next, in *People v. Fierer* (1987), 151 Ill. App. 3d 649, 503 N.E.2d 594, the court determined that the trial court abused its discretion in admitting photographs of the victim taken *during the autopsy*. The court noted that the pictures were " 'grisly pictures, not of external injury inflicted, but of the autopsy.' " (*Fierer*, 151 Ill. App. 3d at 657, 503 N.E.2d at 599, citing *People v. Landry* (1977), 54 Ill. App. 3d 159, 161, 368 N.E.2d 1334, 1336.) Further, there was no issue in the case as to the cause of death.

Similarly, in *People v. Lefler* (1967), 38 Ill. 2d 216, 221, 230 N.E.2d 827, 830, the court held that it was an abuse of discretion to admit photographs of the victim taken "during the process of the autopsy." These pictures were projected on a screen approximately 44

inches by 26 inches in size. The pictures showed the chest cavity after the breast bone, a portion of the ribs and the lungs, heart and main blood vessels had been removed. Further, they showed the skull and portions of the brain after an area of the skull had been removed. The court noted that the deceased bore little superficial evidence of injury and the gruesome nature of the pictures was caused almost entirely by the autopsy procedure. *Lefler*, 38 Ill. 2d at 222, 230 N.E.2d at 830.

Finally, *People v. Davis* (1983), 97 Ill. 2d 1, 452 N.E.2d 525, and *People v. Brisbon* (1985), 106 Ill. 2d 342, 478 N.E.2d 402, *cert. denied* (1985), 474 U.S. 908, 88 L. Ed. 2d 241, 106 S. Ct. 276, both involved multiple murders and the statutory aggravating factor under section 9—1(b)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(3)). The supreme court held in both cases that the admission of photographs of other murder victims during the first phase of the death penalty hearing was irrelevant and unnecessary, when other competent evidence, such as certified copies of murder convictions, adequately established the multiple murder statutory aggravating factor. Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(3).

Defendant's final contention is that the trial court erred in allowing the statements made by the decedent inculpating the defendant, as a dying declaration and a spontaneous declaration. Springfield police officer Richard Daley testified that he responded to a fire at the defendant's home at 6:40 p.m. on July 25, 1987. After authorities arrived at the home, Johnson, who was injured by the fire, was transported to Memorial Medical Center in Springfield. Johnson arrived at the hospital at 7 p.m. and Nurse Kim Conn began to care for her at approximately 8:30 p.m. Conn stated that when she arrived that evening Johnson was in a "tub room" for treatment of her burns. Johnson was not anesthetized because the medical personnel believed she had been drinking alcohol. Conn testified that Johnson was conscious and responded to her questions during treatment. Further, Johnson was combative and stated that she did not want anyone to touch her, and according to Conn: "[A]nytime we wanted to do anything, she wanted to be left alone, at least that's what she indicated to us, 'Leave me alone.' She wanted to roll over and be left alone." Johnson was subsequently taken to a hospital room. Conn testified that at 2 a.m. she was still caring for Johnson in her room and the following occurred:

> "Well, she was sitting up in bed, and she raised herself, which, Your Honor, is unusual to burn that bad to be that alert and to sit up, and she was sitting up gripping the side-rails on the bed, and she was repeating, 'I'm going to get him, I'm going to get

him,' and I went over to her bed and asked, 'Who,' and she said, 'Paul,' and I asked, 'Why,' and she says, 'Because he did this to me.' "

The trial court admitted the aforementioned statements as both a dying declaration and as a spontaneous declaration.

The defendant now contends that the statements were neither a dying declaration nor a spontaneous declaration and were therefore inadmissible hearsay. The defendant argues that the statements did not fall within the dying declaration exception to the hearsay rule because the evidence failed to show that Johnson had a fixed belief and moral conviction that death was impending and certain to follow almost immediately at the time she made the statements to Conn. The defendant further argues that Johnson's statements did not fall within the spontaneous declaration exception to the hearsay rule because the long interval of time between the incident and the statements destroyed the spontaneity.

The State contends that Johnson's statements were properly admissible as both a dying declaration and a spontaneous declaration. As to the former exception, the State argues that Johnson must have known that death was imminent and certain. The State asserts that Johnson sustained second- and third-degree burns to over 60% of her body, Johnson could see her burned flesh and was in considerable pain, and she was told that her condition was serious. The State further asserts that although Johnson was emotionally distraught she was nevertheless coherent and in possession of her faculties. The State acknowledges that Johnson did not specifically state her belief that she was going to die. The State argues, however, that Johnson's resistance to medical treatment "evinced an acceptance of the inevitable." With regard to the latter exception, the State contends that Johnson's statement was a spontaneous reaction to the shock of seeing herself and what the defendant had done to her once she was sober. The State argues alternatively that any error in the admission of the statements was harmless in light of the other competent evidence of defendant's guilt.

■ A dying declaration is a statement of fact by the victim concerning the cause and circumstances of his or her death. (*People v. Newell* (1985), 135 Ill. App. 3d 417, 481 N.E.2d 1238; *People v. Tilley* (1950), 406 Ill. 398, 94 N.E.2d 328.) In order for a statement to qualify as a dying declaration and be admissible into evidence as an exception to the rule against hearsay, the statement must be "made by the victim under the fixed belief and moral conviction that death is impending and certain to follow almost immediately, without opportunity

for repentance and in the absence of all hope of avoidance, when the victim has despaired of life and looks to death as inevitable and at hand." (*Newell*, 135 Ill. App. 3d at 428, 481 N.E.2d at 1247; *People v. Montague* (1986), 149 Ill. App. 3d 332, 345-46, 500 N.E.2d 592, 600.) However, it need not be shown that the defendant has lost every scintilla of a hope of recovery and a nebulous ray of hope does not necessarily render a statement inadmissible. (*People v. Davis* (1981), 93 Ill. App. 3d 217, 416 N.E.2d 1197.) The declarant's belief may be determined by anything said by him or her and also by facts and circumstances surrounding the making of the statement. (*Davis*, 93 Ill. App. 3d at 231, 416 N.E.2d at 1208.) The fact that a declarant does not die until several days after making the statement does not change the rule. It is the state of mind of the deceased and not that of any other person which determines admissibility. *People v. Corder* (1922), 306 Ill. 264, 137 N.E. 845; *People v. Webb* (1984), 125 Ill. App. 3d 924, 466 N.E.2d 936.

■■ Before a dying declaration is admitted into evidence, courts must make an initial determination as to its admissibility and must be convinced, upon weighing all the facts and circumstances surrounding the declaration, that beyond a reasonable doubt all of the elements necessary for a dying declaration are present. Courts must also be convinced that the declarant was sufficiently possessed of his mental faculties as to be able to have accurately perceived, recollected, and communicated the circumstances surrounding his death. (*Davis*, 93 Ill. App. 3d at 231, 416 N.E.2d at 1208.) The standard for judicial review of the admission of dying declarations is whether the record supports the trial court's factual determination. *People v. Van Broughton* (1976), 35 Ill. App. 3d 619, 624, 342 N.E.2d 100, 103.

■■ The trial court's determination in the instant case is not supported by the record. The record does not indicate that Johnson was under the belief that death was impending. Rather, the very nature of her statement suggests that she believed she was going to live and would be able to "get him." Her statements do not suggest that she had only a nebulous ray of hope. Johnson's combative behavior and refusal of treatment could have been due to the fact that she was intoxicated and somewhat delirious due to the severe pain, rather than because she was accepting "the inevitable." Moreover, the testimony shows that none of the medical personnel advised Johnson that she faced imminent death and Johnson never indicated to them that she believed her death was imminent. Consequently, the statements made by Johnson did not constitute a dying declaration.

Nor were the statements admissible under the spontaneous decla-

ration exception to the hearsay rule. Three factors are necessary to bring a statement within this exception to the hearsay rule: (1) an occurrence sufficiently startling to produce a spontaneous and unreflected statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence. (*People v. Poland* (1961), 22 Ill. 2d 175, 174 N.E.2d 804; *People v. Webb* (1984), 125 Ill. App. 3d 924, 466 N.E.2d 936.) " 'The pertinent point is whether there was a lack of sufficient opportunity for reflection and invention.' " (See *People v. Jones* (1985), 105 Ill. 2d 342, 354, 475 N.E.2d 832, 837 (and cases cited therein), quoting *People v. Poland* (1961), 22 Ill. 2d 165, 181, 174 N.E.2d 804, 807.) Here, the occurrence was sufficiently startling to produce a spontaneous and unreflected statement. Further, Johnson's statement related to the circumstances of the startling occurrence. However, a problem arises with the second requirement. Johnson's statement was not made until 7½ hours after the occurrence. Courts have held that lengths of time such as this between the event and the statements render the statements too remote in time to qualify as a spontaneous declaration. (See *People v. Woith* (1984), 126 Ill. App. 3d 817, 467 N.E.2d 614 (several hours); *Jones*, 105 Ill. 2d 342, 475 N.E.2d 832 (eight hours); *People v. Robinson* (1978), 73 Ill. 2d 192, 383 N.E.2d 164 (3½ hours).) Thus, Johnson's statements do not constitute a spontaneous declaration.

However, we have made a thorough review of the evidence presented in this case and conclude that the trial court's admission of these statements was harmless beyond a reasonable doubt in light of the other substantial competent evidence of the defendant's guilt. *People v. Montague* (1986), 149 Ill. App. 3d 332, 500 N.E.2d 592; *People v. Webb* (1984), 125 Ill. App. 3d 924, 466 N.E.2d 936.

Accordingly, the judgment of the circuit court of Sangamon County is affirmed.

Affirmed.

GREEN, P.J., and McCULLOUGH, J., concur.